THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WALTER KRADENYCH, Defendant-Appellant.

First District (2nd Division)    No. 78-1927

Opinion filed April 22, 1980.

Michael J. Goldstein and Price & Banks, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Jeremiah W. Lynch, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

On April 4, 1977, Mary Cantrell (hereinafter referred to as victim) was fatally wounded when a .20-gauge shotgun held by Walter Kradenych (hereinafter referred to as defendant) discharged. Defendant was charged by indictment with her murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(2)). After a bench trial, defendant was convicted and sentenced to serve 14 years to 14 years and one day in the State penitentiary. Defendant appeals his conviction, presenting the following issues for review: (1) whether defendant was proved guilty of murder beyond a reasonable doubt and (2) whether the trial court erred in allowing the prosecution, after trial commenced, to amend its witness list to include two persons who testified to oral, inculpatory statements allegedly made by defendant.

For the reasons hereinafter set forth, we affirm defendant's conviction.

The following evidence was adduced at trial: Ronald Rothmund, a Chicago police officer, testified that on April 4, 1977, he and his partner

responded to a radio call that a woman had been shot at 1114 North Winchester. When he arrived at the building, he proceeded to the second floor apartment where he found a woman lying face down on the kitchen floor in a pool of blood. At this time he noticed a $20 bill in victim's hand, which he took into custody and inventoried. The officer conversed with a Mr. Mikka, who was also present in the apartment, and subsequently went outside to search for a person matching the description given to him by Mikka. As Rothmund returned to the doorway of the building, he noticed a .20-gauge shotgun shell on the ground.

John Ozga testified that on April 4, 1977, between 3 and 4 p.m. he was visited by defendant at 4025 West Palmer where Ozga lived with his mother. Defendant and Ozga conversed in the hallway and defendant asked Ozga if he had any .20-gauge shotgun shells, to which Ozga replied, "No." After Ozga told defendant that he did not know who was "messing around" with Mary (the victim), defendant stated that "he was going to catch him or her, kill him or her." There was no one else present during this conversation. Ozga's mother had previously left the apartment, and his girlfriend, although present in the apartment, was not in the vicinity of the conversation.

At an undetermined date subsequent to April 4, 1977, Ozga saw defendant at a basketball court and inquired about defendant's court case. Defendant replied that "he got off, or he thinks he is going to get off because it was an accidental death." Approximately two weeks to a month after this encounter, the two men again had occasion to meet at the same basketball court. Ozga inquired "how it happened and if he meant it," to which defendant replied, "Yeah, I think I meant it because she two-timed on me." Ozga never mentioned these conversations to the police because he did not think he would be a witness and did not want to get involved. The first time Ozga told anyone about his various conversations with defendant was when he spoke to the assistant state's attorney approximately two days prior to the day he testified.

Bruce Mikka testified that on April 4, 1977, at approximately 5-5:30 p.m. he was at his home at 1114 Winchester with his fiancee, Sophie Kurkowski, preparing dinner. Defendant arrived accompanied by his girlfriend, Mary Cantrell (victim); she went into the kitchen with Kurkowski, and defendant requested that Mikka accompany him to the living room. At defendant's request, Mikka loaned defendant $20 so that defendant and victim could go to a motel. While still in the living room, defendant was holding a brown, double-barrelled, sawed-off shotgun which he had brought with him to Mikka's apartment. During this conversation, defendant engaged in a "flipping action" with the gun which he produced by releasing a lever which allowed the gun to open and close by the movement of defendant's hand. While in Mikka's

apartment, there were no harsh words exchanged between defendant and the victim, and she in no way indicated that she felt threatened.

The two men left the living room. Mikka returned to the kitchen and defendant, still carrying the weapon, went to the bathroom, where he remained for a few minutes. When defendant emerged, Mikka was at the stove. He glanced over his right shoulder and saw the gun lifted in the air. Mikka stated at trial that defendant pointed the gun "at" victim, and it discharged. However, the witness testified at the preliminary hearing that when he looked over his shoulder he "noticed the shotgun being lifted in the air and it blasted." Mikka also testified that he did not actually see defendant pull the trigger, but the victim was shot as a result of the "blast."

Immediately after the shot, both Kurkowski and Mikka screamed and Kurkowski ran from the apartment. Mikka told defendant to leave, whereupon defendant stated, "Don't tell anybody." Mikka left the apartment after defendant and saw defendant in the gangway dismantle the shotgun and leave the building. Mikka then found his fiancee and told her to notify the police.

Sophie Kurkowski's testimony substantially corroborated that of her fiance, Bruce Mikka. She stated that while she was at his apartment on April 4, 1977, at approximately 5 p.m., defendant and victim arrived together. No loud words were exchanged between the couple, and victim made no attempt to leave the apartment. Kurkowski did not see anything in defendant's hand when he went to the living room with Mikka, but when the two men returned to the kitchen, defendant was carrying a sawed-off shotgun. Defendant then went into the bathroom, but she was not certain whether he took the gun with him. The next time that she noticed the gun, defendant had it in his hand and he was standing near the kitchen table. She was sitting at the table with her back to the victim, but she could see defendant from that position. Defendant fired the gun, she turned around, saw the victim lying on the floor and then ran from the apartment down the stairs. She heard defendant ask Mikka to "not tell anyone." Defendant left the apartment after she did and ran past her down to the gangway where she observed him take the gun apart.

Although at the grand jury investigation Kurkowski testified that defendant "pointed the gun at" the victim, she was actually unable to see the victim from her seat at the table, immediately preceding the gunshot, and therefore could not ascertain where defendant was pointing the gun.

Hasey Petich testified that she was well-acquainted with the Cantrell family and had known the victim since she was two years old. On April 4, 1977, between 4 and 5 p.m., Petich was at a tavern and saw defendant walk past her to the back of the bar. Defendant had a shotgun shell in each hand, and he raised his left arm stating, "This bullet is for Mary,"

then raised his right arm stating, "This is for Puerto Rican Ray." Petich left soon after defendant and went to a drugstore to pick up some medicine. While there, she attempted to contact the victim's residence by telephone but the line was busy. Petich stated that she did not call the police during this time, but when she returned home she again unsuccessfully attempted to contact the victim's residence. She was not contacted by the police, nor did she contact them about defendant's threat.[1] She told the victim's family about the incident in the bar, but the first time she told any official was a few days prior to trial when she talked to the assistant state's attorney.

Sophie Ozga testified that on April 4, 1977, her son John was living with her. She left her house at approximately 2:30 p.m. to go to work. She did not see defendant that day, nor did she know whether her son had any shotguns in the apartment at that time. Police officers came to her house and confiscated a .12-gauge shotgun which they found behind the couch.

Robert Podgorny, a Chicago police officer, testified that on April 4, 1977, he began an investigation into the death of Mary Cantrell. In connection with the investigation, his partner received an anonymous telephone call concerning the location of the murder weapon, and they proceeded to the home of John Ozga. When Mrs. Ozga answered the door, they informed her that they were looking for her son and the weapon used to kill Mary Cantrell. Mrs. Ozga gave them permission to look in the apartment and, contrary to Mrs. Ozga's testimony at trial, Officer Podgorny stated that she told him that on the day of the shooting she saw defendant in her apartment. She further told the officer that she had seen a gun in the china cabinet prior to defendant's arrival, but that it was not there after his departure. Podgorny stated that the officers recovered a .12-gauge shotgun from the apartment, although it was not the murder weapon. They found no .20-gauge shotgun but discovered some .20-gauge shotgun shells in the china cabinet. Officer Podgorny requested that Mrs. Ozga ask her son to contact the officers. Officer Podgorny reduced his conversation with Mrs. Ozga to writing in the form of a supplementary report to Homicide.

Defendant testified that prior to April 1977 he and Mary Cantrell (victim) were "in love" and planned to marry. Defendant spent the 30 days prior to April 4, 1977, in the House of Corrections for criminal damage to property. Immediately after his release, defendant went to the victim's home where he remained for a few hours. Two men, known to both defendant and victim, arrived, and the four of them left in an automobile driven by one of the other men. Defendant did not have a gun

---

[1] When asked why she did not tell anyone about the occurrence, the witness stated that she "felt that they had enough witnesses." Defense counsel objected to this testimony, and the objection was sustained.

with him at this time. They made various stops and eventually arrived at John Ozga's house. Defendant went into the house alone and talked with Ozga in the presence of Ozga's girlfriend. He never told John Ozga that he was going "to get" anyone and never had a conversation with him concerning Mary and the male she may have been dating. When defendant left Ozga's apartment, he had a .20-gauge shotgun but no shells for it.

Defendant and the victim then went to Bruce Mikka's apartment. When he entered the apartment, defendant put the shotgun on the kitchen table where Sophie Kurkowski was sitting. He and Mikka went to the living room where defendant asked to borrow $20 to go to a motel and offered to leave the shotgun as collateral. After Mikka loaned him the money, defendant asked the victim to hold the $20 bill for him. Defendant stated that he never went to the bathroom and that the gun had remained on the kitchen table while he was talking to Mikka. Defendant picked the gun up from the table and began to "toy with it," and the gun discharged while he was "flipping it." He did not see where the victim was at the time. After the shot, Kurkowski and Mikka were screaming. Defendant stated that when he saw victim lying on the floor, he said, "Oh, my God, I am sorry, it was an accident." When Mikka told him to leave the apartment, he went downstairs and in the gangway he dismantled the gun.

Prior to the testimony of Hasey Petich, defendant stated that he had never heard of her. He denied that he was at the Winchester Inn on April 4, 1977. He denied making a statement about having bullets for "Mary" and "Puerto Rican Ray." Based on the foregoing, defendant was convicted of murder and appeals.

## I.

Defendant initially contends that he was not proved guilty of murder beyond a reasonable doubt because the only evidence that would justify such a finding was the testimony of two witnesses whose credibility was severely weakened through impeachment. The State maintains that the testimony of these witnesses was credible; further, absent the testimony of these two witnesses, there was sufficient evidence to convict the defendant.

Defendant insists that the credibility of John Ozga and Hasey Petich was "absolutely destroyed" through impeachment and contradictions. Defendant argues that Ozga's testimony was twice impeached by the testimony of Officer Podgorny;[2] that he lacked credibility because he did

---

[2] Contrary to defendant's characterization of Officer Podgorny's testimony, it should be noted that the alleged impeachment related to the testimony of Mrs. Ozga, not her son John. Mrs. Ozga testified consistently with her son concerning the events of April 4, 1977. The

not know the specifics regarding the time, day or date of defendant's alleged statements at the basketball court, and he failed to relate the information concerning these conversations to any officials until just prior to trial. Defendant argues that Petich's testimony was not credible because of its improbability and her failure to notify authorities at the time of defendant's threats even though she knew the victim.

The credibility of witnesses is a matter to be determined by the trier of fact. (*People v. Byrd* (1961), 21 Ill. 2d 114, 171 N.E.2d 782; *People v. Richardson* (1971), 132 Ill. App. 2d 712, 270 N.E.2d 568.) In a bench trial this determination is reserved for the trial judge. (*People v. Tillis* (1976), 40 Ill. App. 3d 66, 351 N.E.2d 332.) Additionally, conflict in testimony should be resolved by the trier of fact (*People v. Smith* (1980), 81 Ill. App. 3d 764, 401 N.E.2d 1017), and it is not "conclusive that the defendant offered testimony inconsistent with guilt, for such testimony presented only a question of credibility * * *." (*People v. Richardson*, at 714.) In the case at bar the court was well aware of the alleged lack of credibility of witnesses Ozga and Petich. In rendering its decision the trial court stated that it had an opportunity to observe the demeanor of the witnesses, assess their credibility and discern any motivational factors bearing on truthfulness. Not having the same opportunity to observe the trial, a reviewing court should not substitute its judgment absent proof that is "so unsatisfactory, improbable, or implausible as to justify a reasonable doubt as to defendant's guilt." *People v. Tillis*, at 68-69.

Defendant maintains that the dispositive issue in his reasonable doubt argument is the credibility of Ozga and Petich since the two occurrence witnesses, Kurkowski and Mikka, allegedly corroborate defendant's claim that the shooting was accidental. Although the credibility of Ozga and Petich has been determined by the trial court, and we do not question that determination, we note that even absent the testimony of Ozga and Petich, the trial court may still have found defendant guilty of murder beyond a reasonable doubt.

Mikka and Kurkowski corroborated the *circumstances* of the shooting, but their testimony does not compel a finding that it was accidental, since defendant's *intent* at the time of the shooting was in issue. Intent may be inferred based on the overall circumstances of the case (*People v. Thorns* (1978), 62 Ill. App. 3d 1028, 379 N.E.2d 641), and the trier of fact has a right to believe or disbelieve defendant's assertion of his state of mind at the time of the offense (*People v. Thomas* (1978), 60 Ill. App. 3d 673, 377 N.E.2d 195).

In the case at bar neither Mikka nor Kurkowski actually saw defendant pull the trigger, and both indicated that the victim did not appear threatened, nor was she arguing with defendant immediately

---

impeachment of Mrs. Ozga based on the police officer's written report was hearsay and in no way directly impeached the testimony of John Ozga.

preceding the shooting. However, both witnesses testified that after the shot, defendant requested that Mikka not "tell anyone," and both stated that defendant left the scene of the crime, albeit at the request of Mikka. "Evidence of flight has long been admissible in Illinois as a circumstance which may be considered with all other evidence as tending to prove guilt." *People v. Richardson* (1971), 132 Ill. App. 2d 712, 714-15, 270 N.E.2d 568.

In addition to the above evidence, the trial court could have chosen to disbelieve defendant's assertion that he offered the shotgun as collateral for the $20 loan from Mikka. Without this explanation of defendant's possession of the firearm, the court could have unfavorably inferred defendant's purpose for having the weapon with him that day. Mikka testified that defendant borrowed the money but did not indicate that the gun was ever offered to him as collateral. The court could have resolved this seeming conflict in testimony in the State's favor. (*People v. Smith* (1980), 81 Ill. App. 3d 764, 401 N.E.2d 1017.) It does not appear that the evidence adduced at trial was insufficient to convict defendant of murder beyond a reasonable doubt; therefore, we will not disturb the trial court's determination.

Defendant next contends that he was unduly prejudiced by the State's failure to disclose, as required by Supreme Court Rule 412[3] (Ill. Rev. Stat. 1977, ch. 110A, par. 412(a)(ii)), oral statements allegedly made by defendant to Petich and Ozga. The State maintains that the identity of these witnesses was promptly brought to the attention of the defense, and further that defendant had sufficient opportunity to extensively interview them prior to their testimony.

The facts pertinent to this controversy are as follows: On Wednesday, February 15, 1978, one day prior to trial, the State informed defense counsel that Petich might be called as a witness and that she would testify regarding an alleged oral statement made by defendant. They also informed counsel that they might call John Ozga, who was at that time in the Marines stationed in San Diego, but they did not inform counsel that defendant had also allegedly made oral, inculpatory statements to Ozga. On Thursday, February 16, 1978, defendant waived his right to a jury trial and the first witness was sworn; the State then moved to amend its witness list to include four additional witnesses, two of whom were Ozga and Petich.

Sometime during the first day of trial, the State was informed by authorities that Ozga would be flown to Chicago to testify. On Friday, February 17, 1978, the assistant state's attorney interviewed Ozga.

---

[3] Rule 412(a)(ii) provides for disclosure of "any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements."

Defense counsel was also given an opportunity to talk with Ozga on the morning of February 17, 1978, before trial commenced for that day. Defense counsel then argued a motion *in limine* contending that since the State failed to disclose these witnesses as requested in defendant's motion for discovery, their testimony pertaining to oral statements allegedly made by defendant should be excluded. In denying the defense, motion, the court stated that "there is nothing * * * to show that the State in any way consciously, inadvertently or in any manner whatsoever suppressed certain things * * * or an attempt [sic] to deceive the defendant so far as witnesses." The court then heard the testimony of Ozga and the two occurrence witnesses, Mikka and Kurkowski.

When the trial resumed on Tuesday, February 21, 1978, defendant moved for a mistrial contending that the State had failed to disclose, prior to trial, inculpatory statements allegedly made by defendant to Ozga. In support of his motion, defendant argued that Ozga's testimony at trial on February 17, 1978, revealed, for the first time, that two days earlier, prior to the commencement of trial, the assistant state's attorney had a telephone conversation with Ozga in which Ozga informed the assistant state's attorney of the alleged inculpatory statements made by defendant. Defendant further argued that these alleged inculpatory statements, which were known to the State prior to trial, were not disclosed to him until February 17, 1978, one day after trial had commenced and he had already waived his right to a jury trial. This motion for a mistrial was denied. We note that defendant did not move for a mistrial or request a jury trial on the morning of February 17, 1978, when he interviewed Ozga and discovered the import of his testimony.

In a criminal prosecution the State has a duty to disclose, upon defendant's request, any oral statements made by defendant and known to the State. (*People v. DeBord* (1978), 61 Ill. App. 3d 239, 377 N.E.2d 1308.) These disclosure requirements, as contained in Supreme Court Rule 412, are mandatory. (*People v. Boucher* (1978), 62 Ill. App. 3d 436, 379 N.E.2d 339.) They were promulgated to protect an accused against unfairness, surprise and inadequate preparation as well as to allow the defense an opportunity to investigate the circumstances surrounding the statement. (*Boucher*.) The only excuse for failure to disclose occurs when the prosecutor is unaware of the existence of the statement prior to the trial and he could not have become aware of its existence in the exercise of due diligence. *People v. Shegog* (1976), 37 Ill. App. 3d 615, 346 N.E.2d 208; *People v. Young* (1978), 59 Ill. App. 3d 254, 375 N.E.2d 442.

In the case at bar, defendant argues that the State's failure to begin its investigation and preparation of this case until three weeks prior to trial evidenced a lack of "due diligence," since the State would have been aware of defendant's statements early enough for defense counsel to

discover them prior to trial. In support of this contention defendant relies upon *Shegog* and *Young*, where the prosecutor's failure to become aware of statements made by defendant and in the possession of some law enforcement agency was determined to be a lack of due diligence, resulting in a new trial for the accused. However, unlike *Shegog* and *Young*, in the instant case the information was not known to the state's attorney's office nor any agency in which the State maintains a "proper flow of information." (*Shegog*, at 617.) These cases do not appear to impose a duty upon the State to fully investigate every possible aspect of a case by a particular point in time prior to trial in an effort to apprise defendant of potential witnesses and evidence not yet in the possession of the State. The record clearly indicates that the State was not previously aware of the existence of Petich nor of the substance of Ozga's testimony until the eve of trial. Although it does appear from the record that there may have been a day or two interval before this information was given to the defense, it is not apparent from the record that this was due to lack of diligence on the part of the State.

Even assuming, *arguendo*, that the State's efforts in this matter were not sufficiently diligent, defendant had every opportunity to request additional time to investigate the circumstances and interrogate the witnesses prior to their in-court testimony. Where the trial court is aware of defendant's surprise or any potential prejudice and gives counsel every opportunity to adequately investigate the case, defendant's failure to avail himself of these opportunities negates his contention of surprise or prejudice. (*People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126; *People v. Welch* (1961), 22 Ill. 2d 558, 177 N.E.2d 160.) The decision to allow unlisted witnesses to testify when no surprise or prejudice is shown by the defense is within the sound discretion of the trial court. (*People v. Jones* (1973), 13 Ill. App. 3d 684, 301 N.E.2d 85; *People v. Hunsaker* (1974), 23 Ill. App. 3d 155, 318 N.E.2d 737; *People v. Welch.*) In the instant case the trial court took every opportunity to assure that defendant was not unduly prejudiced. This is especially evident in view of the trial court's statement to defense counsel:

> "[P]rior to the State calling those witnesses, if you so desire, I will give you whatever ample time you may deem necessary to talk to those witnesses, if they are here and wish to talk to you or not wish to talk to you, [sic] or whatever, you may need insofar as time prior to the State calling them."

Defense counsel nevertheless failed to request even one continuance for purposes of investigation. It appears then that even if there was a failure on the part of the State to timely disclose defendant's alleged oral statements, defendant was afforded an opportunity by the trial court to cure any prejudice occasioned by the State's omission.

Defendant implies in his brief that he might not have waived a jury trial had he been advised by the State, prior to his waiver, of the unculpatory statements allegedly made by defendant to Ozga. This argument, in our opinion, appears specious, however, since it was not raised until defendant's motion for a mistrial on Tuesday, February 21, 1978, after Ozga and two other witnesses had testified. Since no mention was made by defendant of this issue in his motion *in limine* on Friday, February 17, 1978, we must conclude that defendant's failure earlier to complain negates any substantial influence such statement would have had on his decision to waive a jury trial.

In accordance with the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

DOWNING and HARTMAN, JJ., concur.