THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LAWRENCE SMITH, Defendant-Appellant.

First District (2nd Division)   No. 78-1525

Opinion filed February 5, 1980.

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Paul C. Gridelli, and Paul D. Kerpan, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Defendant, Lawrence Smith, after a bench trial was found guilty of attempt murder and attempt armed robbery. The trial court sentenced defendant to concurrent terms of 8 to 15 years for attempt murder and 4 to 12 years for attempt armed robbery. Defendant appeals, presenting the following issues for review: (1) Whether defendant was proved guilty of attempt murder and attempt armed robbery beyond a reasonable doubt; (2) whether defendant was deprived of effective assistance of counsel; and (3) whether defendant's sentence should be modified.

On December 2, 1974, a Cook County grand jury indicted defendant on two counts of aggravated battery, one count of attempt murder and one count of attempt armed robbery. The indictments charged that defendant committed the offense of aggravated battery in that he committed a battery on George Martis, a peace officer engaged in the execution of his official duties, in violation of section 12—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 12—4(b)(6)); that defendant committed the offense of aggravated battery in that he used a deadly

weapon in committing a battery on George Martis, in violation of section 12—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 12—4(b)(1)); that defendant committed the offense of attempt murder in that he attempted to kill George Martis by shooting at him with a gun, in violation of section 8—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 8—4); and that defendant committed the offense of attempt armed robbery in that he attempted to take property from Arthur Bell by threatening Bell with a dangerous weapon, in violation of section 8—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 8—4).

The following testimony was adduced at trial:

On January 27, 1974, at approximately 5:45 p.m. Officer Richard Pooler and his partner, Officer George Martis, were patrolling in their marked police car near the intersection of 95th and LaSalle Streets in Chicago. Both officers were in uniform. As the police car, driven by Officer Martis, proceeded west on 95th Street toward the intersection of 95th and LaSalle Streets, Officer Pooler noticed a truck parked on LaSalle Street, approximately 30 feet north of the northeast corner of the intersection, in front of a liquor store. Pooler also noted that the truck driver, later identified as Arthur Bell, was standing partially outside the cab of the truck, and that defendant was holding a gun to Bell's head. Another man stood approximately five feet to the east of defendant and Bell.

Pooler instructed Martis to turn right (north) onto Wentworth Avenue (one block west of LaSalle Street) and then turn right (east) into an alley north of 95th Street. The police car exited the alley on LaSalle Street behind the truck and was parked on the west side of the truck so that it could not be seen by defendant. Martis proceeded around the back of the truck and Pooler proceeded around the front of the truck.

Pooler apprehended and searched the third person, a Kenneth Wesley. Pooler then heard Martis shout, "police officers, drop your gun." Pooler then heard two gunshots. As Pooler proceeded around the front of the truck, holding Wesley by the arm, he saw Martis crouching along the wall of the building and saw defendant, with his back to Pooler, shooting at Martis. Pooler testified that he believed defendant had fired at Martis two times. Martis then fell to the ground and shouted, "get him, Ritchie." Pooler fired at defendant who then turned around and aimed his gun at Pooler. Pooler fired again. Defendant again aimed his gun at Pooler, and Pooler fired two more shots. Defendant spun around and again aimed his gun at Pooler. Pooler fired two more shots. Defendant then fell to the ground and attempted to crawl away, holding the gun "stuck straight out." Martis got up and wrested the gun, a Sterling .25 automatic pistol, from defendant.

Officer Martis testified that after he parked the police car behind the

truck, he proceeded around the rear of the truck and saw defendant holding a gun to the head of Bell. Martis told defendant to drop his gun, whereupon defendant turned, said "[expletive deleted]" and fired at Martis. Martis was struck by a bullet which his jacket deflected.[1] As Martis fell to the ground, he fired only one shot. Martis further testified that defendant "fired some more shots at me as I fell to the ground." On cross-examination Martis reiterated: "* * * I saw him fire a few more shots at me. I saw the flashes." Martis also testified that defendant had kicked him in the right side.

The police inventory slip indicated that defendant's gun's magazine contained five unspent bullets. Three bullets were recovered from defendant's pocket. Although both Officers Pooler and Martis were acquainted with the .25-caliber automatic pistol, neither knew, nor could they determine from examining the gun, the bullet capacity of the weapon. Both officers identified the gun as that used by defendant.

Ella Springer testified that on January 27, 1974, she had parked her automobile on the west side of LaSalle Street near the intersection of 95th and LaSalle Streets. She saw a large truck parked on the east side of LaSalle Street. As she crossed LaSalle Street, she heard a man's voice say, "I don't have any money." A moment later she heard another voice say, "police, drop your gun." She then "heard the shot." Ms. Springer "looked around" and saw three men standing near a truck and a police officer fall down. She then ran from the scene. Approximately 10 minutes later she returned and observed a man lying on the sidewalk, bleeding. Ms. Springer was unable to identify this man as defendant.

Defendant testified that on January 27, 1974, he had been drinking and talking with four friends near the entrance of a liquor store at 95th and LaSalle Streets. One of the men, a Buddy Marshall, exhibited a gun which he wanted to sell for $20. Defendant examined the gun for three or four minutes but then said, "Man, I don't have any money." Defendant further testified that, in examining the gun, he had removed the magazine from the gun and had removed the bullets from the magazine. Defendant was reloading the magazine when he heard, "police officers, drop your gun."[2] Defendant threw the gun down and began to run. Two of his companions also ran.[3]

Defendant heard five shots before he was hit in the leg and fell. After he fell, Officer Martis jumped on him and deliberately shot him in the buttocks. Defendant demonstrated to the court how the first bullet had entered the back of the thigh approximately one inch above the knee and

---

[1] Martis was not injured by the bullet. A stipulation was entered into that his "jacket had a mark on it." After the incident, Pooler took Martis to the hospital "for oxygen and x-rays."

[2] Defendant testified that he had reloaded five of the bullets and that the remaining bullets were in his hand.

[3] His other two companions had left the scene earlier.

how the second bullet entered the buttocks (from the rear) approximately four to six inches below the waist.[4] The State did not contradict nor rebut this testimony.

Defendant admitted that on March 10, 1975, he had been convicted in Federal court for unlawful distribution of a controlled substance. He also acknowledged that he knew it was "illegal to purchase a gun from someone on a street corner."

The trial court found defendant guilty of attempt murder and attempt armed robbery. The trial court, in accordance with section 8—2—4(b) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1008—2—4(b)), explained to defendant the penalties under both the sentencing law in effect at the time of the offense and the current sentencing law. Defendant chose to be sentenced under the sentencing law in effect at the time of the offense.

At the hearing in aggravation and mitigation the State introduced the testimony of one Dane Pugh who alleged that defendant had robbed him on January 29, 1975. Defendant objected to Pugh's testimony because it related only to a crime for which defendant had been indicted but not yet tried and convicted.

Pugh testified that on January 29, 1975, at 6:30 a.m., while on his way to work, he was walking north on Lafayette Street near the intersection of 96th and Lafayette Streets. Defendant, who was walking south on Lafayette Street, approached Pugh and inquired if Pugh could light defendant's cigarette. Pugh replied in the negative and continued walking. Defendant told Pugh that if he didn't stop walking he "could get shot." At that time another man whom Pugh described as being shorter than defendant came around the corner from a nearby house. This man carried a pistol and told Pugh, "give me all of your money." Pugh gave the man $50 in paper currency. Defendant then searched Pugh and took some coins from him. Pugh was told to walk away and not to look back. Pugh did as instructed. Pugh testified that the entire incident occurred in approximately five minutes.

As Pugh was walking he saw a "paddy wagon" at 95th and State Streets and reported the robbery to the officers. The officers in the "paddy wagon" called for a patrol car. Pugh then "cruised" the neighborhood with the police officers in the patrol car, looking for the offenders. Pugh observed the offenders at the intersection of 95th and Normal Streets, approximately 10 minutes after the robbery. The police arrested and searched the two men. Pugh identified defendant as one of the men arrested by the police.

Pugh further testified that to his knowledge the police had not

---

[4] Defendant also testified that he was hospitalized for six months during which time he underwent a colostomy and three operations on his leg. He testified that as a result of the shooting he has permanent nerve damage to his leg and bowels.

recovered his money from defendant. Pugh acknowledged that his in-court testimony conflicted to some extent with the police report of his oral statement which he had given at the time of the robbery. However, Pugh testified that, although the second page of the report was accurate, "the third or last page it was all switched around." Pugh also testified that prior to the offenders being observed at the intersection of 95th and Normal Streets, Pugh had described defendant to the police as being approximately 24 years of age, 5 feet 10 inches tall, weighing approximately 160 pounds and wearing a long coat and skull cap.

Officer Lawrence Dunn testified that on January 29, 1975, he received a call to interview a robbery victim, Dane Pugh. As he and Pugh were "cruising" the vicinity, Pugh apprised him of the robbery and described the offenders. Dunn then observed two men, fitting the description Pugh had given him, emerge from the gangway. Dunn stopped the squad car, arrested and searched the two men. Dunn did not recover the $50 from either defendant or his companion.

Defendant testified that at the time of his arrest and search, he had no money other than his bus fare. He denied that he had robbed Pugh. Defendant testified that, contrary to Pugh's testimony, he had weighed approximately 140 pounds in January 1975. Defendant is five feet seven inches tall. Defendant further testified that prior to his arrest on January 29, 1975, he had just departed from the home of a friend[5] to go to work. As defendant walked, he encountered a Leonard Clark[6], whom defendant did not know other than to recognize by sight. As defendant and Clark were talking, the police arrived and arrested them. Defendant observed someone in the police car but was not aware that it was Pugh.

Defendant's wife testified that defendant was supporting her and her eight-year-old son.

The State argued that defendant had a history of criminal activity, including a conviction for unlawful distribution of a controlled substance. Defendant argued that "since the time of his marriage [2½ years ago] he has not had any involvement with the law"; and that the presentence report indicated that defendant held a position of trust with his current employer. In pronouncing the sentence the trial court stated:

> "The court has also considered and heard the testimonial evidence that was presented in aggravation as well as the testimonial evidence that was presented in mitigation, the arguments presented in aggravation as well as the arguments that were presented in mitigation. The court has also evaluated the various sentencing possibilities in this situation and has also taken

[5] Defendant thought the friend's name was Veronica. He had met Veronica the evening before at a party.

[6] Defendant was unsure whether Clark had given the name of Leonard Clark or Larry Sykes to the police.

into consideration the facts of the case and *what appeared to be on the part of the defendant in this case in chief a willingness to use deadly force and also what appears to be a pattern of criminal behavior involving violence of a period of time having regard for all of these circumstances the nature of this—of the offenses involved here and the history and character of the defendant* the court hereby sentences Lawrence Smith on attempt murder eight to fifteen years in the custody of the Illinois Department of Corrections and on the conviction for attempted armed robbery four to twelve years in the Illinois Department of Correction and this both sentences to run concurrent." (Emphasis added.)

Subsequent to the sentencing in the case at bar, the State chose to *nolle prosequi* defendant for the alleged robbery of Dane Pugh.

## I.

Defendant contends that he was not proved guilty of attempt murder and attempt armed robbery beyond a reasonable doubt because "the weapon allegedly fired by defendant could not have been fired at all on that occasion" and because "defendant could not have been wounded in the manner to which the officers testified." The State maintains that the testimony of Officers Martis and Pooler was credible, and that defendant's theory that the weapon could not have been fired is speculative and ignores the testimony of Officers Martis and Pooler.

■■ It is well settled that when a defendant elects to justify his presence at or near the scene of the crime, he must tell a reasonable story or be judged by its improbabilities. (*People v. Spagnolia* (1961), 21 Ill. 2d 455, 173 N.E.2d 431; *People v. Rollins* (1976), 42 Ill. App. 3d 308, 356 N.E.2d 124.) This is not to say that a defendant has the burden to justify his presence at or near the scene of the crime. A defendant does not have to testify. However, when a defendant does elect to testify and attempts to justify or explain his presence at the scene of a crime, his testimony, as the testimony of all other witnesses, will be subject to the scrutiny of the trier of fact.

The absence of a cartridge in the weapon's firing chamber and the nature and location of defendant's wounds were matters to be resolved by the trier of fact. Since the trial court as a trier of fact is peculiarly suited to determine questions of truthfulness, a reviewing court will not readily substitute its own conclusion unless the proof is so unsatisfactory as to justify a reasonable doubt of guilt. (*People v. Boney* (1963), 28 Ill. 2d 505, 192 N.E.2d 920.) To the extent that testimony is conflicting, it is the province of the trier of fact to resolve the conflict and decide which witness or witnesses will be believed. (*People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644; *People v. Bowen* (1975), 26 Ill. App. 3d 182,

324 N.E.2d 652.) Conflict in testimony does not in itself establish a reasonable doubt of defendant's guilt. *Bowen; People v. Clanton* (1973), 16 Ill. App. 3d 593, 306 N.E.2d 486.

■■■ Discrepancies in testimony, such as how many shots were actually fired at Martis or how many shots were fired by Pooler, do not destroy the credibility of the witnesses but go only to the weight to be afforded to their testimony. (*People v. Montgomery* (1977), 51 Ill. App. 3d 324, 366 N.E.2d 623.) Where the trier of fact renders a decision based upon credible and substantial evidence which is sufficient to convict, the verdict may not be set aside merely because of minor inconsistencies which the trier of fact properly chose to resolve in favor of the State. (*People v. Pelegri* (1968), 39 Ill. 2d 568, 237 N.E.2d 453; *People v. Sullivan* (1977), 48 Ill. App. 3d 555, 362 N.E.2d 1313.) Nor need the trier of fact be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt. It is sufficient if all the evidence, taken together, satisfies the trier of fact beyond a reasonable doubt of the accused's guilt. Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. *People v. Hanson* (1935), 359 Ill. 266, 194 N.E. 520; *People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.

■■ On this record it cannot be said that the trial court's determination as to the weight and credibility to be given the officers' testimony over defendant's testimony was manifestly erroneous. The evidence presented by the State is not improbable, unconvincing or contrary to human experience. The State's case, in view of all the evidence, has few inconsistencies and none sufficient to raise a reasonable doubt as to defendant's guilt. Although the weapon was not inventoried as having a cartridge in the chamber, we cannot say that the weapon was not fired. Pooler saw defendant fire at Martis. Martis testified that his jacket in fact was "grazed" by a bullet. Martis also testified that he saw flashes from defendant's gun as defendant fired at him.

The location and nature of defendant's wounds do not create a reasonable doubt of defendant's guilt. Pooler testified that defendant was spinning around in an attempt to evade Pooler's bullets. We cannot say that the location of defendant's wounds renders Pooler's testimony improbable.

## II.

Defendant next contends that he was deprived of effective assistance of counsel because defense counsel failed to familiarize himself with the operation of a Sterling .25-caliber automatic pistol. In support of his contention, defendant argues that due to counsel's ill-preparedness, the trial court was not aware of evidence which would have resulted in

defendant's acquittal. The State maintains that defense counsel adequately elicited the relevant aspects of the weapon's operation, that any further testimony would have been merely cumulative and would not have resulted in defendant's acquittal.

■■ Defendant is entitled to assistance of counsel under both the United States Constitution (*Gideon v. Wainwright* (1963), 372 U.S. 335, 342, 9 L. Ed. 2d 799, 804, 83 S. Ct. 792, 795) and the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §8). "Counsel * * * can be so incompetent as to undermine that right and to deprive the defendant of his due process right to a fair trial." (*People v. Murphy* (1978), 72 Ill. 2d 421, 436, 381 N.E.2d 677.) In reviewing the competency of appointed trial counsel, a two-prong test has been used. First, it must be shown that trial counsel was actually incompetent in carrying out his duties. Second, it must be demonstrated that substantial prejudice resulted from the trial counsel's incompetency. (*People v. Dudley* (1970), 46 Ill. 2d 305, 263 N.E.2d 1, *cert. denied* (1971), 402 U.S. 910, 28 L. Ed. 2d 651, 91 S. Ct. 1386; *People v. Lewis* (1977), 55 Ill. App. 3d 1022, 371 N.E.2d 672; *People v. Bouse* (1977), 46 Ill. App. 3d 465, 360 N.E.2d 1340.) In determining whether privately retained counsel is incompetent we are guided by our supreme court's directive in *Murphy* at page 436:

> " '* * * the court will not reverse a conviction because of the incompetency of counsel unless the representation is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or sham.' "

In the case at bar the record fails to indicate with clarity whether defendant's counsel was privately retained or appointed. However, the incidents of incompetency alleged by defendant do not meet either of these tests; nor does a review of the record find any further evidence of incompetency on trial counsel's part.

Defendant appears to urge this court to discard the above cited standard in favor of the adoption of a higher standard requiring reasonably effective representation. The Seventh Circuit adopted this proposed standard in *United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634, 640. The court in *Twomey* determined that counsel's conduct fell short of the expected professional standard of competent counsel. However, in both *Murphy* and *People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164, decided the same day, the Illinois Supreme Court declined to adopt the minimum level of competency standard.

■■ No test has been formulated which will, in advance of close scrutiny of the trial record, furnish a definitive checklist of what is needed to sustain a defendant's assertion of constitutional deprivation of effective assistance of counsel. The present test is the product of competing public policies. On the one hand every defendant should have available the

means of securing every legal defense possible. On the other hand there is the practical recognition that no attorney is perfect, no trial tactic failsafe, few courtroom trials error proof. (*People v. Ortiz* (1974), 22 Ill. App. 3d 788, 317 N.E.2d 763.) A second reason for allowing some flexibility in the test is to protect against mere pretended incompetence on the part of the attorney. *People v. Fleming* (1971), 50 Ill. 2d 141, 277 N.E.2d 872.

Our review of the competency of counsel does not extend into areas involving the exercise of judgment, discretion or trial tactics by counsel, even though appellate counsel and the reviewing court might have acted in a different manner. (*People v. Martin* (1970), 44 Ill. 2d 489, 256 N.E.2d 337; *People v. Lewis* (1977), 55 Ill. App. 3d 1022, 371 N.E.2d 672.) Moreover, the competency of trial counsel is to be determined from the *totality of counsel's conduct at trial.* (*Murphy*, at 437.) As stated in *People v. Morris* (1954), 3 Ill. 2d 437, 121 N.E.2d 810, each case must be judged on its own particular facts as they appear in the context of the proceeding under consideration. It is within the above framework that we examine the alleged failings of counsel in the case at bar.

Defendant argues that counsel "was eminently capable of phoning the Sterling Gun Corporation in Buffalo, New York, the manufacturers of the weapon, and finding out that the .25 calibre automatic pistol has a six shot capacity," yet he failed to so do. Defendant also argues that counsel "could have gone to the Public Library and consulted a gun catalogue," but failed to so do. Defendant further argues that counsel could have demonstrated the capacity of the weapon "by loading the gun for the trial judge" but failed to so do. Defendant contends that evidence of the capacity of the weapon would have discredited the officers' testimony that defendant fired two or three times because five unspent bullets were found in the weapon.[7] Defendant further argues that counsel failed to point out to the court that no cartridge had been found in the gun's firing chamber "where it certainly would have if defendant had fired" as he was alleged to have done. Defendant contends that "such argument would have resulted in defendant's acquittal."

Counsel's judgment in not introducing more evidence may or may not have been poor judgment. But errors in trial judgment or strategy do not establish competency. (*Murphy*, at 437.) Counsel's closing argument demonstrates a familiarity with the weapon. Counsel forcefully and effectively argued that no spent cartridges had been found even though the incident had occurred in a small area and many officers were present immediately after the incident.

Defendant has objected to the above-cited omissions of trial counsel but has failed to cite any of counsel's affirmative steps, including but not

---

[7] We note that the appendix to defendant's brief is not conclusive regarding the capacity of a Sterling .25-caliber automatic pistol. Model 402 has an eight-shot capacity and Model 300 has a six-shot capacity.

limited to, filing a petition to vacate bond forfeiture and answering the State's motion for pretrial discovery. In addition, through effective cross-examination of the police officers, counsel elicited inconsistencies which would detract from their credibility. Counsel also effectively argued that the State failed to produce Kenneth Wesley to testify to the alleged robbery.

■■ In addition, mere conjecture by appellate counsel that a more thorough investigation might have produced evidence favorable to defendant does not support a claim of prejudice. *People v. Lewis* (1975), 60 Ill. 2d 152, 158, 330 N.E.2d 857.

■■ We therefore conclude that defendant was not denied effective assistance of counsel.

### III.

Defendant contends that his sentence should be reduced because it was based in part upon evidence of a subsequent charge which the State thereafter dismissed by *nolle prosequi*. He argues that the "prosecutors' tactics were to have his sentence increased because of the subsequent crime and to overcome judicial leniency which would otherwise be expected in this case." Defendant further asserts that the State, "satisfied that it had established a 'pattern of violent criminal behavior,' chose not to subject the subsequent charge to a trial where they would have a burden of proof beyond a reasonable doubt." The State maintains that defendant was correctly sentenced after a hearing in aggravation and mitigation and that any determination by the State to forego future felony prosecutions on other outstanding indictments against defendant should not detract from the appropriate performance by the trial court of its statutory duties.

At the outset we note that the sentence imposed in this case was within the statutory limits. (Ill. Rev. Stat. 1977, ch. 38, par. 8—4(c).) In order to modify the sentence under these circumstances, we would have to find a manifest and arbitrary abuse of the trial court's discretion. Such abuse will be found to exist if the sentence imposed is greatly disproportionate to the nature of the crime. (*People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673; *People v. Willett* (1976), 44 Ill. App. 3d 545, 358 N.E.2d 657; *People v. Ford* (1972), 4 Ill. App. 3d 291, 280 N.E.2d 728.) We emphasize once again that sentencing is primarily the function of the trial judge who sees the defendant and is in a better position to appraise him and evaluate the likelihood of his rehabilitation. (*Willett*, at 552.) It is not the function of the appellate court to serve as a sentencing court; nor will an appellate court substitute its judgment for that of the trial court merely because the appellate court would have imposed a different sentence had that function been delegated to them. *People v. Perruquet* (1977), 68 Ill. 2d 149, 156, 368 N.E.2d 882.

■■ It would appear that the sentencing standards of *People v. Adkins*

(1968), 41 Ill. 2d 297, 242 N.E.2d 258, are applicable to the instant case. In *Adkins* our supreme court stated at page 301:

> " '* * * The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry. It may look to the facts of the [crime], and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and, as was said in *People v. Popescue*, [345 Ill. 142], the judge should know something of the life, family, occupation and record of the person about to be sentenced.' *People v. McWilliams*, 348 Ill. 333 at 336. See also *People v. Popescue*, 345 Ill. 142; *People v. Mann*, 27 Ill. 2d 135; Ill. Rev. Stat. 1967, chap. 38, par. 1—7(g)."

Proof of a pending indictment, as in the instant case, is properly presentable in a hearing of aggravation and mitigation. (*People v. Bey* (1972), 51 Ill. 2d 262, 267, 281 N.E.2d 638; *People v. Jones* (1976), 36 Ill. App. 3d 491, 344 N.E.2d 40.) The rationale for allowing evidence of pending indictments is to afford the trial judge a fuller knowledge of defendant's prior conduct so that he may sentence accordingly. *Jones*, at 494.[8]

In the instant case the evidence gave a full presentation of the facts surrounding defendant's conduct and relating to his potential for rehabilitation. The victim of the robbery (Pugh) and the arresting officer (Dunn) were present to be confronted and cross-examined by defendant. Care was exercised to assure the adequacy of the information considered. *People v. Davis* (1976), 38 Ill. App. 3d 649, 348 N.E.2d 533.

■■ Although defendant's sentence was more than the minimum, its length does not indicate that the trial judge was sentencing defendant for the robbery of Pugh. Rather, the sentence reflects the trial court's awareness of defendant's conduct as it related to his potential for rehabilitation, a consideration which the court is duty bound to evaluate in determining the sentence. Inquiry into that prior conduct which resulted in criminal charges against defendant was within reasonable bounds, and the information adduced was properly considered by the trial court.

We note that the robbery of Pugh was not the sole aggravating factor. The trial judge stated that he "studied very carefully and relied on" the presentence report. The presentence report disclosed that defendant had

---

[8] In *Jones*, three witnesses testified at the sentencing hearing concerning two crimes with which defendant was charged, such crimes having occurred between the time of defendant's arrest and the sentencing hearing.

been A.W.O.L. from the army and was given a dishonorable discharge in 1969; that defendant was a heroin addict until 1975; and that at the time of the instant offense defendant was on Federal probation for unlawful distribution of a controlled substance.

Finally, we consider the effect, if any, of the State's decision to dismiss the indictment for the Pugh robbery by *nolle prosequi.* The authority to prosecute and dismiss criminal charges prior to a trial is invested by statute in the State's Attorney. (Ill. Rev. Stat. 1977, ch. 14, par. 5(1), (6); *People v. Byrnes* (1975), 34 Ill. App. 3d 983, 986, 341 N.E.2d 729.) The indictment for the Pugh robbery was a separate and distinct charge, and its final disposition does not affect the instant case. (*People v. Gee* (1974), 18 Ill. App. 3d 1058, 310 N.E.2d 662.) The subsequent dismissal by *nolle prosequi* did not defeat nor contravene the rationale for allowing evidence of pending indictments. Nor did it impede or detract from the trial court's ability to appraise defendant and evaluate the likelihood of defendant's rehabilitation.

Based upon the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS and DOWNING, JJ., concur.