THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JESSE B. FREEMAN, Defendant-Appellant.

First District (2nd Division)   No. 78-1608

Opinion filed June 17, 1980.

Ralph Ruebner, Public Defender, of Chicago (Nancy Abrahams, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Alphonse R. Tomaso, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Jesse B. Freeman (hereinafter defendant) was charged by information with armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), of which he was found guilty following a bench trial. His post-trial motions to allow newly discovered evidence and for a new trial or alternatively acquittal were denied, and he was sentenced to a term of six years in the penitentiary. The issues he raises in this appeal are whether: he was proved guilty beyond a reasonable doubt; he was denied effective assistance of counsel; the rebuttal testimony of a prosecution witness was properly admitted into evidence; and the State's failure to introduce into evidence certified copies of two prior theft convictions on which he was cross-examined constitute reversible error. For the reasons set forth below, we find no error and affirm.

The following account of the crime was given by the State's chief witnesses at trial, Ruby Parker (hereinafter Parker), her sister Ida Hatley (hereinafter Hatley) and Rochelle, Hatley's 15-year-old daughter (hereinafter Rochelle). At approximately midnight on May 21, 1977, Parker, Hatley, Rochelle and three young children were in the brightly lit

parking lot of Parker's apartment building located at 1040 West 14th Street in Chicago, at the back of Hatley's car unloading Parker's packages from the trunk. A man with a revolver in his hand approached from the west side of the lot, announced a "stick-up," and ordered Parker to put everything she had back in the car and be quiet. When she hesitated, he turned to Hatley and told her to give him the keys. Told by Hatley that her husband had the keys, the man swore at her and said he had seen them enter the parking lot alone. He put the gun to Hatley's head and threatened to kill her if she did not give the keys to him. He snatched her purse, which she had taken from the front seat of the car, put it on the ground and started looking through it, finally carrying it away with him as he left.

Parker described the man as wearing a "cranberry brown" suit, black shirt and beige straw hat at that time, and identified defendant in court as the man who had robbed Hatley. She described the gun he carried as "shiny." On July 15, 1977, she was a patient at Mary Thompson Hospital when at about noon she saw defendant, walking in the third-floor corridor outside her room about 20 to 25 feet away from her and dressed in the same clothes and hat as he had been at the time of the robbery. She recognized defendant's face as well as his clothes when she saw him in the hospital. She told a nurse she saw a man who had held her up. Again at about 4 p.m. that day she observed defendant going into his room, which was opposite her own. At about 7 p.m., Parker spoke to a security guard concerning defendant and also called her sister's house. The man who robbed her did not have a beard and was about 6' tall.

Rochelle identified defendant at trial as the man who took her mother's purse. On July 16, 1977, at about 7:30 p.m., she was at Mary Thompson Hospital with her mother and father visiting her aunt. She went to the third floor with her father, while her mother remained in the hospital lobby for a time. On that floor, she recognized the man who had robbed her mother. She then went with her father to her aunt's room, where she remained after her father left. On cross-examination, Rochelle described the robber as about 6' tall, clean shaven but with a small mustache on his upper lip and a bandage over his left eye. The gun he held during the robbery was black but not shiny. After seeing the man again at the hospital, she told her father and aunt about it. When Rochelle's mother came up to the room after her father had gone, she told Rochelle she too had seen the robber in the hospital.

Hatley identified defendant at trial as the man who robbed her, and testified that the purse he took contained identification papers for her car, a birth certificate, a blank checkbook and approximately $27 in cash. On July 16, 1977, at about 7:30 p.m., she went to Mary Thompson Hospital with her husband and daughter to visit her sister and observed defendant in the third floor corridor. Later, at the hospital, she identified defendant

as the robber and he was arrested. On cross-examination, she testified that the assailant's height was "maybe six foot"; she did not recall testifying at the preliminary hearing that he was " 'about five, nine.' " She remembered that he was "clean shaved," with a mustache and a bandage over his eye. She talked to her sister by telephone on the evening of July 15, 1977, and was told that the robber was a patient in the hospital across the hall from her. When she saw defendant in the hospital he did not have a beard.

Victor Lightfoot testified for the defense that he was a placement counselor who formerly worked at the Tri-Faith Employment Project. On June 21 or 22 of 1977, defendant came to the Tri-Faith office seeking employment. He had "hair all over his face" which Lightfoot told him would prevent his getting a job. Two or three days later defendant returned to the employment office clean-shaven. On cross-examination Lightfoot disclaimed any knowledge of defendant's appearance, including facial hair, on May 21 or 22 of 1977.

Carolyn Freeman, defendant's wife (hereinafter Freeman), testified that on May 22, 1977, he had a beard and had one when he graduated from college in June of 1976. He did not shave it off until June of 1977 for a job interview. From midnight on May 21 until the morning of May 22, 1977, defendant was at home with her and did not leave the house. They watched "Saturday Night Live" and part of the movie "Joe," which were on television that evening. She and defendant had gone to the public library to look at the newspapers for the day in question, and the television guide had refreshed her memory that they watched T.V. Defendant did not own or possess a gun. Around the 22d of May 1977, she worked part-time at Osco Drugs and daily for Johnson Publications, earning $200 per week at the latter job. On cross-examination, she testified that until the previous day she and defendant believed the robbery had occurred on the evening of May 22 rather than the 21st. She had worked at Osco until midnight on the evening of the 22d, but had not worked the prior evening. She was "pretty sure" defendant owned a straw hat in May of 1977.

Dr. William Norcross testified for the defense that when he was on the staff of Mary Thompson Hospital on the 13th and 16th of July 1977, both defendant and Parker were his patients. He knew the latter not as Ruby Parker but rather as Ruby Tyler. Defendant had been admitted to the hospital with an abscess under his arm such as was usually caused by deodorant. Defendant had a beard in February 1977, when he first became a patient of Dr. Norcross. Although he did not know how long defendant had the beard, the doctor saw him at a later time without it and was told defendant was going for a job interview.

Defendant testified on his own behalf that he did not take Hatley's

purse and had never seen her before July 16, 1977. On that date, he was packing to leave the hospital when he was taken down to the security office by hospital guards and police officers. The Hatleys were there, and Ida Hatley identified him as her assailant. He was then taken to Parker's room and identified by her. He had a beard when he graduated from college in June of 1976; it was not shaved off until around June 20, 1977. He never owned or used a gun and had never been found in possession of one, or of Hatley's purse. He testified on cross-examination that when he was arrested for the offense he was given the impression that the crime had occurred during the evening hours of May 22, 1977, when he was at home watching "Ben Hur" on television. When the trial began, he realized that the offense had occurred during the evening of May 21 into the morning of May 22. He and his wife then went to the library, saw that "Joe" and "Saturday Night Live" had been on television at that time, and remembered watching those programs on the evening of May 21. Over defense objection, the State elicited that defendant had been convicted twice previously for theft and once for possession of stolen mail. Defendant owned two straw hats on May 21, 1977, but did not think he wore one on that date. He had three scars on his forehead, two of which were at or near the hairline. He was 6'2" tall and weighed 160 pounds, which he also weighed in May of 1977.

Larry Nikodem, assistant manager for the Osco Drug Store located at 3531 N. Broadway, testified for the State on rebuttal. He was in charge of personnel and wrote a daily work schedule for the employees. On May 21, 1977, Carolyn Freeman, defendant's wife, was an Osco employee. He checked her time card for the date in question before coming to court, which was in her handwriting and indicated that she worked from 5:30 p.m. to 11 p.m. on that date. The time card itself was not admitted into evidence. Over defense objection, Nikodem testified that Freeman's employment was terminated for stealing from Osco. On cross-examination Nikodem acknowledged that he did not know Freeman's handwriting on sight, and explained that the payroll records reflected only total hours worked per pay period rather than per day.

Carolyn Freeman testified in surrebuttal that she was dismissed from work at Osco due to a misunderstanding over payment for a carton of cigarettes. Although later asked to return to work, she declined. Both the State and the defense then rested.

Following argument, the court assessed defendant's alibi evidence as having "too many discrepancies," although defendant "probably had a beard." On the strength of the eyewitness identifications of defendant and other State's evidence, the court entered a finding of guilty and judgment thereon.

A hearing was held on defendant's post-trial motions on September 6, 1978, presented by new counsel. A motion to allow newly discovered evidence alleged that the time cards for Osco employees were filled out in advance, and Nikodem would testify that Freeman probably filled out the time card admitted into evidence at trial before May 21. Commenting that whether Freeman was working on the evening of the 21st "did not merit much consideration in [its] finding of guilty" and that it had based its finding and judgment on the identifications of the eyewitnesses to the robbery, the court denied the motion. Defendant's motion for a new trial or, alternatively, for acquittal relied primarily upon the purported incompetence of trial counsel, chiefly for his failure to prepare an alibi defense for the correct period of time and to object to Nikodem's testimony as hearsay. Again reviewing the eyewitness and circumstantial evidence of guilt adduced at trial, the court denied the motion and sentenced defendant as previously described.

## I.

Defendant first contends that he was not proved guilty beyond a reasonable doubt, emphasizing identification of him as the assailant occurred two months after the alleged crime and was based upon the clothing he was wearing, the discrepancy between the eyewitnesses' testimony that the robber did not have a beard and other evidence that defendant did have a beard on May 21 and 22, 1977; and the variation between Hatley's estimates of her assailant's height as 5'9" at the preliminary hearing and as 6' at the trial. He contends that the combination of a clothing-based identification with descriptions omitting the beard and incorrectly stating height casts "tremendous doubt" on the in-court identifications of him as the assailant. He refers specifically to Parker's testimony that it was the outfit worn by the man she saw in the hospital on July 15, 1977, that made her recognize him, and that she told both Ida and Rochelle Hatley of her identification before they saw defendant, as evidence of the tentativeness of the identifications. Parker's testimony, however, was that she recognized defendant by his face as well as by his dress. Moreover, while she did inform the other two eyewitnesses that she had seen the robber at the hospital, each viewed defendant individually and made separate identifications of him. *People v. Moore* (1972), 6 Ill. App. 3d 932, 287 N.E.2d 130, cited by defendant in this context, is distinguishable; a rape conviction there was reversed in a decision based expressly upon the high level of scrutiny required in such cases (6 Ill. App. 3d 932, 935) and a notable absence of incriminatory evidence that should have been available under the State's theory. 6 Ill. App. 3d 932, 936-37.

Defendant contrasts the State's evidence that the robber had no

beard with testimony of defendant, his wife, Lightfoot and Dr. Norcross, all of whom, according to defendant, testified that defendant was bearded. In fact Lightfoot said defendant had a beard about one month after the alleged occurrence and shaved it off a few days thereafter, while Dr. Norcross testified that defendant was bearded in February of 1977 but clean-shaven subsequently, though when he didn't recall. Both witnesses expressly disclaimed knowledge of whether defendant had any facial hair on May 21 and 22, 1977, when the robbery occurred. Discrepancies between the eyewitnesses' descriptions and his appearance go to the weight their testimony is to be accorded by the trier of fact (*People v. Winston* (1975), 28 Ill. App. 3d 237, 239, 328 N.E.2d 49), and must be considered against such other inculpatory evidence as: the general coincidence of their height and weight descriptions with defendant's features; consistent testimony that the assailant had a mustache; the coincidence of a straw hat worn by the robber and owned by defendant; the identity of the clothes worn by defendant at the hospital as those worn by the assailant when the robbery occurred; and the testimony that the man who attacked them had a bandage on his forehead, where defendant possessed several scars. Taking such corroborative circumstances with the certainty of the separate identifications at the hospital, we cannot regard defendant's guilt as drawn seriously into question by the claimed discrepancies, even accepting *arguendo* that he did have some facial hair when the crime was committed. See *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 616-17, 378 N.E.2d 1318; *People v. Rogers* (1975), 32 Ill. App. 3d 788, 790, 336 N.E.2d 784, *appeal denied* (1975), 58 Ill. 2d 598.

Neither is the difference of three inches in Hatley's estimates of her assailant's height at the preliminary hearing and later at trial decisive; precise accuracy in describing height is unnecessary where a positive in-court identification is made. (*People v. Smith* (1977), 52 Ill. App. 3d 583, 587, 367 N.E.2d 756; *People v. Summers* (1977), 49 Ill. App. 3d 70, 75, 362 N.E.2d 1347; *People v. Calhoun* (1971), 132 Ill. App. 2d 665, 270 N.E.2d 450.) Minor discrepancies such as these or contradictions in the testimony of a witness do not render his testimony patently incredible (*People v. Guido* (1962), 25 Ill. 2d 204, 208, 184 N.E.2d 858; *In re Winslow* (1977), 46 Ill. App. 3d 962, 967-68, 361 N.E.2d 622), but rather go to the weight of the testimony as evaluated by the trier of fact (*Mendoza*, 62 Ill. App. 3d 609, 616-17). Reliance by defendant upon *People v. Martin* (1968), 95 Ill. App. 2d 457, 238 N.E.2d 205, and *People v. Marshall* (1966), 74 Ill. App. 2d 483, 221 N.E.2d 133, in this context is misplaced, since the conviction in each of those cases was based upon the testimony of a *single* eyewitness whose height estimate was considerably different from the defendant's actual height.

## II.

Defendant also argues that he was denied effective assistance of counsel, relying primarily upon defense counsel's misinterpretation of the State's answer to discovery which listed the offense as having occurred at 12:15 a.m. on May 22, 1977. Counsel appears to have informed defendant and his wife that the crime occurred on the evening of the 22nd rather than the evening of the 21st. They did not discover the error until after the trial began and had one day before testifying to discover what they had been doing on the date in question. As a result, lengthy and confusing testimony was allegedly required of defendant and his wife concerning their trips to the library to refresh their recollection of what they had been doing on the evening of May 21. Defendant also finds incompetence in his trial counsel's failure to object to Nikodem's testimony as hearsay, and his failure to elicit on cross-examination the fact that the time cards on which his testimony as to Freeman's work schedule was based were prepared in advance.

Acknowledging that the prevailing standard in this jurisdiction for reversal applicable to competency of counsel issues where, as here, counsel has been privately retained is whether " '* * * the representation is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or sham' " (*People v. Murphy* (1978), 72 Ill. 2d 421, 436, 381 N.E.2d 677, quoting *People v. Torres* (1973), 54 Ill. 2d 384, 391, 297 N.E.2d 142), defendant nevertheless urges adoption of the minimal standard of representation within the range of competence demanded of attorneys in criminal cases adopted in *United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634, and maintains that his defense counsel's conduct violated the "farce or sham" test in any event.

■■ This court recently reviewed a competency of counsel argument in the context of an alibi defense in *People v. Connor* (1980), 82 Ill. App. 3d 652, 402 N.E.2d 862. In that case, as in the present one, in the absence of any showing of what additional testimony or other exculpatory evidence might be presented at a new trial beyond the mere speculation that such might exist, we held, and now hold, that defendant failed to show either actual incompetency from the totality of the circumstances or substantial prejudice resulting therefrom affecting the outcome of the trial, the two elements required under the more liberal standard applicable to cases involving court-appointed counsel. *People v. Dudley* (1970), 46 Ill. 2d 305, 263 N.E.2d 1, *cert. denied* (1971), 402 U.S. 910, 28 L. Ed. 2d 651, 91 S. Ct. 1386; *People v. Morris* (1954), 3 Ill. 2d 437, 449, 121 N.E.2d 810; *People v. Smith* (1980), 81 Ill. App. 3d 764, 401 N.E.2d 1017; *People v. Bland* (1978), 67 Ill. App. 3d 716, 724, 384 N.E.2d 1380.

■■ As to the length and confusion of his and his wife's testimony

regarding their activities on the evening when the robbery did in fact occur, this developed as a result of intense cross-examination, one of the purposes of which is to test the veracity and accuracy of direct testimony. (*Connor*, 82 Ill. App. 3d 652, 658.) The evidence contained in defendant's offer of proof in his post-trial motion, to the effect that the time cards were commonly made out before the hours were worked, may have possessed some probative value; however, it did not corroborate Freeman's trial testimony that she was at home that evening rather than working. In view of the other evidence, we cannot regard its absence at trial, even if chargeable to defendant's trial counsel, as resulting in substantial prejudice to defendant requiring reversal or a new trial.

### III.

■■■ The third issue defendant raises concerns the "time card" and other substantive testimony of Nikodem, said to consist entirely of hearsay and to be inadmissible under any exception thereto. Conceding that under the business records exception to the hearsay rule, "❋ ❋ ❋ it is the business record itself, and not the testimony of a witness who makes reference to the record, which is admissible" (*Smith v. Williams* (1975), 34 Ill. App. 3d 677, 680, 339 N.E.2d 10; Ill. Rev. Stat. 1977, ch. 110A, par. 236(a)), the State maintains nonetheless that Nikodem's testimony was offered solely for the purpose of impeaching Freeman's testimony on the night of the offense. Since offered not to prove the truth of the matter asserted, but rather to cast doubt on Freeman's testimony by showing her inconsistency, his testimony was not subject to a hearsay objection. (*People v. Armstrong* (1961), 22 Ill. 2d 420, 424, 176 N.E.2d 755; *Smith*, 34 Ill. App. 3d 677, 681.) The trial court placed no significant reliance on the evidence defendant objects to in any event. (*People v. Boyce* (1977), 51 Ill. App. 3d 549, 561, 366 N.E.2d 914.) In the absence of a contrary showing, it is presumed the court considered only competent evidence in a bench trial. *People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102.

■■ We regard differently, however, the testimony elicited by the State from Nikodem that Freeman's employment was terminated for stealing. It is fundamental that the reputation of a person cannot be impeached by particular acts of bad conduct. (*E.g., People v. Hermens* (1955), 5 Ill. 2d 277, 287, 125 N.E.2d 500; *People v. Myers* (1968), 94 Ill. App. 2d 340, 350, 236 N.E.2d 786.) The attempted impeachment was in this instance particularly egregious since directed against a defense witness rather than defendant himself. Good character was not placed in issue as to either of them; however, in light of the other evidence of defendant's guilt upon which the trial court expressly relied, we cannot say defendant was so prejudiced as to have been denied a fair trial.

## IV.

█ Defendant argues as his final point that his cross-examination by the State concerning two prior theft convictions was reversible error in view of the State's failure to introduce into evidence certified copies of those convictions, citing *People v. Chisum* (1975), 30 Ill. App. 3d 546, 333 N.E.2d 546, and *People v. Walker* (1967), 84 Ill. App. 2d 264, 288 N.E.2d 597. The State acknowledges error in this respect but contends that, inasmuch as defendant's only objection to the cross-examination at issue related to whether or not the convictions were for similar types of crimes, he has waived any other ground of objection for purposes of appeal, citing *People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166; alternatively, it urges that reversal is not required unless it deprived defendant of substantial justice or influenced the determination of his guilt. (*People v. Madison* (1974), 56 Ill. 2d 476, 488, 309 N.E.2d 11; *People v. Morehead* (1970), 45 Ill. 2d 326, 332, 259 N.E.2d 8, *cert. denied* (1970), 400 U.S. 945, 27 L. Ed. 2d 251, 91 S. Ct. 251.) In *Walker* "[t]he question was solely one of veracity between defendant and [the complainant]," and the cross-examination so ambiguously phrased as to only insinuate the commission of prior crimes, thereby encouraging the trier of fact to speculate as to their nature and extent. (84 Ill. App. 2d 264, 268.) In *Chisum*, the court, after reviewing the evidence of the defendant's guilt, concluded that "[t]he cross-examination, though objectionable * * * did not constitute reversible error in the total circumstances of the case." (*Chisum*, 30 Ill. App. 3d 546, 548.) Considering the weight of inculpatory evidence and the trial court's express reliance thereon in determining defendant's guilt, we cannot find that the error committed when the State failed to tender certified copies of defendant's convictions for evidentiary admission following his cross-examination on them requires reversal.

For the aforesaid reasons defendant's conviction must be affirmed.

Judgment affirmed.

STAMOS and DOWNING, JJ., concur.