THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE DEVINE, Defendant-Appellant.

Third District   No. 80-682

Opinion filed October 15, 1981.

HEIPLE, J., specially concurring.

Robert Agostinelli and Michael Filipovic, both of State Appellate Defender's Office, of Ottawa, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SCOTT delivered the opinion of the court:

The defendant, Willie Devine, was charged by indictment with two counts of deviate sexual assault and one count of indecent liberties with a child in violation of sections 11—3(a) and 11—4(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, pars. 11—3(a), 11—4(a)(3)). Following a jury trial, he was convicted on one count of deviate sexual assault and of indecent liberties with a child. He was acquitted of the remaining count of deviate sexual assault. A sentence of 20 years' imprisonment for deviate sexual assault and a concurrent term of 10 years' imprisonment for indecent liberties with a child were imposed on the defendant.

The facts adduced at trial revealed the following sequence of events. Rodney Hatfill, the complainant, testified that he first met the defendant in July 1980, when Hatfill and a friend of his, 25-year-old Jimmy Dalton, went to the defendant's apartment to play cards. Hatfill was 12 years old at the time.

Two black girls were present at the apartment with the defendant when Hatfill and Dalton arrived. Everyone played cards for about half an hour when two men arrived with a bottle of beer. Hatfill testified that he

had a glass of beer and smoked some marijuana. The two men stayed about 20 minutes and then left.

Hatfill further testified that the two girls left the apartment to go shopping. Jimmy Dalton then left, saying he would return in 15 minutes. Hatfill and the defendant were left alone in the apartment.

The complainant was sitting on a couch in the kitchen when the defendant came over and started squeezing the youngster's penis through his pants. Hatfill told the defendant to stop it. Devine then took Hatfill by the hand into the bedroom. Hatfill began to cry, and the defendant threatened to hit him with a claw hammer. The hammer, which had previously been in the living room, was retrieved by the defendant and placed in the bedroom.

Hatfill testified that the defendant told him to take off his pants. When he failed to do so, the defendant took them off, and Hatfill began to cry more. The defendant then raised the hammer, and Hatfill stopped crying. The defendant removed his shorts, made Hatfill lie on his stomach and inserted his penis into Hatfill's anus. When Hatfill started screaming, the defendant got up, started to pick up his hammer, and then placed his penis in the complainant's mouth. The complainant testified that he "acted like" the defendant had ejaculated in his mouth and then asked the defendant if he could wash out his mouth. The defendant said "Yes", and the complainant went to the bathroom. The complainant testified that he observed the defendant wiping the "cum" off his penis and stomach with a brown towel.

According to his testimony, Hatfill "acted like" he had washed his mouth out. The defendant returned Hatfill's pants to him and said, "Don't never tell anybody." The complainant unlocked the door and ran down the stairs. While running down the stairs he passed the two girls who had previously been in the apartment, but he did not say anything to them. Hatfill ran to Imogene Knott's house, where his friend, Jimmy Dalton, lived. The police were called and arrived about five minutes later. Hatfill directed the police to Willie Devine's apartment. The complainant was then taken to the hospital and later to the police station where he made a statement.

During cross-examination defense counsel confronted the witness with a number of inconsistent statements which he made to the police and the examining doctor. Hatfill denied making the inconsistent statements.

Jimmy Dalton appeared as the second witness for the State. His testimony of events preceding the attack by Devine substantially corroborates that of the complainant, Rodney Hatfill.

Officer Henry Minton testified that he met Rodney Hatfill, Imogene Knott and Jimmy Dalton at 6:50 p.m. on July 11, 1980, at the Knott residence. After speaking with Hatfill, Minton proceeded to 505 West

Third Street, where he left Hatfill in his squad car and met some other police officers. The officers proceeded up to the second floor and knocked on the door. Willie Devine answered. Present in the apartment in addition to the defendant were two black females and a small child. Devine left with the officers. Hatfill was then transported to St. Francis Hospital.

Officer Larry Layman testified that on July 14, 1980, he and Officer Minton returned to Devine's apartment and served a search warrant which mentioned two items. The two items—a broken, silver-colored claw hammer and a brown towel—were recovered. The hammer was found in the kitchen behind a couch, and the towel was lying on the couch in the living room of the house. After a thorough search for other towels was made, no other brown towels were found in the apartment.

Layman related that he spoke to Devine on July 11, 1980, and learned that the defendant was born on June 11, 1957, and was thus 23 years of age.

The final witness for the State was Dr. John Byler, who examined the complainant at St. Francis Hospital emergency room on July 11, 1980. He performed a general examination, and a specific exam of Hatfill's anal/rectal area. The doctor testified that "[t]here were two or three small fissures which are small cracks in the anal/rectal mucosa at about 6 o'clock and the tone of the sphinctor [*sic*] was patchless, that is in appearance, it appeared to lack a normal tone." The normal tone of a sphincter of a boy that age would generally be fairly tight. The loose and patchless sphincter and the fissures would be consistent with some type of penetration. The fissures seen on Hatfill's anus would also be consistent with constipation or straining in going to the bathroom. The fissures were probably not more than 12 hours old. The doctor could not say for sure whether or not the fissures were caused by anal penetration. He related that the tone of the sphincter was consistent with penetration, but not constipation.

The doctor also noted that the complainant had very poor hygiene and was dirty. Both oral and rectal swabs were taken from the complainant for later testing. The doctor also noticed a brownish ring around the anus which he could not interpret as being either stool or blood.

Also testifying for the State were Mrs. Cynthia Galowski, an emergency room nurse, and Officers Larry Layman and Henry Minton. Their testimony will be recounted as needed to discuss the inconsistencies alleged by the defendant.

For the defense, Willie Devine testified that he lived at 505 West Third Street for about six months to a year. He lived there with his girlfriend and a two-year-old baby. Devine recalled being visited at his apartment by Jimmy Dalton and Rodney Hatfill on July 11, 1980,

between 11:30 and 12:00. Dalton asked Devine where he could buy a bag of marijuana. Devine took Dalton's money, purchased some marijuana from a man down the street and returned to the apartment.

Both Dalton and Hatfill appeared "pretty high" when they first came by the apartment. While at the apartment they played cards and drank beer. Devine testified that Hatfill drank four to seven beers and that he smoked some marijuana.

Devine further testified that he had not had an argument with Dalton, but that he thought Dalton was mad at him because he had given Dalton's girlfriend a key to his apartment. When the girls left the apartment, they said they were not going to be gone for long, but Devine could not recall them saying how long they would be gone. After eating some pinto beans and cornbread, Dalton left the apartment and said he would be back in a couple of minutes.

Hatfill sat on the couch in the living room, and Devine began washing his dishes. The two girls then returned to the apartment. Devine was alone with Hatfill for 20 to 30 minutes. Devine testified that he did not talk with Hatfill about sex and did none of the things which he was accused of doing and did not force Hatfill to have sex with him.

On cross-examination, Devine testified that he had a hammer in his kitchen on the sink. He also testified that he thought Hatfill was 14 to 15 years old, and that Dorothy (Bertha) Smith, the woman who lived with him, had a key to his apartment.

Patricia Orr, a forensic scientist with a specialty in serology, testified that pursuant to a Peoria Police Department request, she tested the contents of defendant's exhibit number 1, a "rape kit." The kit contained the following items: (1) Rodney Hatfill's pants, (2) rectal swab of Hatfill, (3) oral swab of Hatfill, (4) rectal smear (swab smeared on glass slide), (5) oral saliva, (6) liquid blood standard of Hatfill, (7) dried saliva standard of Hatfill. Orr performed a number of tests upon the oral and rectal smears and swabs and could not identify any seminal material on them.

Orr also examined defendant's exhibit No. 3, the brown towel seized by the police from Devine's apartment. She first examined it with an ultraviolet light which causes seminal material to glow. Orr also performed an acid phosphate test on the towel, but was unable to identify any seminal material on the towel.

Orr also examined Hatfill's pants for the presence of seminal material or pubic hairs. She had in her possession known samples of the defendant's pubic hair. Orr was unable to find seminal material or pubic hairs. Orr testified that she found no evidence on any of the items which would have indicated sexual contact between the defendant and Hatfill.

On cross-examination Ms. Orr testified that if the towel had been washed, seminal material could have been removed during washing.

On redirect examination Orr related that the towel in this case had a faint odor and a few crusty areas. She tested the towel in many areas and based on her scientific background and training concluded that the towel contained no seminal material.

Willie Devine was recalled to the stand, and the defense then rested.

The first issue raised by the defendant on appeal is whether the evidence proved him guilty beyond a reasonable doubt. Specifically, he contends that there are several inconsistencies in the evidence, which, together with the scientific evidence presented by the defendant, negates his guilt. We disagree.

It is well established that a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses, and criminal convictions are not subject to reversal unless the evidence is so improbable as to raise a reasonable doubt of the defendant's guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) This is true even in those cases involving sex offenses where the reviewing court has a special duty to closely scrutinize the evidence. (*People v. Muellner* (1979), 70 Ill. App. 3d 671, 388 N.E.2d 851.) If the decision of the trier of fact is to convict, and that decision is based on credible and substantial evidence, it will not be set aside because of minor inconsistencies which the trier of fact resolved in favor of the State. *People v. Smith* (1980), 81 Ill. App. 3d 764, 401 N.E.2d 1017; *People v. Sullivan* (1977), 48 Ill. App. 3d 555, 362 N.E.2d 1313.

In the case at bar, each of the inconsistencies complained of was presented to the jury which resolved them against the defendant. We have no quarrel with the jury's determinations.

The first alleged inconsistency involved the complainant Hatfill's testimony concerning a statement made by Jimmy Dalton. According to Hatfill, Dalton, upon leaving the defendant's apartment, told Hatfill to stay there and that he would be back in 15 minutes. Dalton testified that he told Hatfill that he would be back, but that he did not say how long he would be gone. The defendant testified that Dalton said he would be back in a couple of minutes. As it relates to the question of the defendant's guilt, this alleged inconsistency is a nonsequitur. The period of time after Dalton left the defendant's apartment and before the attack occurred is inconsequential. The vital question is, given all of the testimony and evidence presented, whether reasonable men and women could find, beyond a reasonable doubt, that an attack occurred.

The second alleged inconsistency concerns the testimony of the complainant and of Officers Minton and Layman regarding how Hatfill got into the defendant's bedroom. Specifically, the inconsistency arises from whether the defendant fondled the complainant on the kitchen

couch and then led him into the bedroom by the hand or whether the defendant called Hatfill into the bedroom. This alleged inconsistency is understandable given the fact that the complainant was upset and crying when he spoke to the police officers following the attack. It is reasonable to assume that not every detail of the attack would be revealed by the victim under such circumstances, and that his trial testimony might differ to some degree.

The third alleged inconsistency concerns whether the defendant struck the complainant. A close examination of the record indicates, however, that no inconsistency exists in the challenged testimony of Hatfill and Officer Layman. What does appear is an indication that the defendant threatened to strike the complainant on several occasions, but that he never carried out his threats.

Two additional alleged inconsistencies concern whether the defendant ejaculated and whether semen was present on the brown towel offered into evidence. Because the question of whether the defendant ejaculated is irrelevant to the question of whether the crimes of deviate sexual assault and indecent liberties with a child occurred, we find these allegations by the defendant strained at best.

■■ The defendant also contends that Hatfill's story was contradicted by the scientific evidence presented. On the contrary, the testimony of Dr. Byler tends to corroborate the victim's account of anal penetration. Furthermore, Hatfill's prompt reporting of the crimes to the police adds corroborative weight to his testimony. For these reasons, we reject the guilt-beyond-a-reasonable-doubt issue raised by the defendant and decline to disturb the findings of the trier of fact whose responsibility it is to pass upon the credibility of the witnesses and the weight of the evidence. *People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285.

■■ The second issue raised by the defendant is whether the evidence was sufficient to establish that he was 17 years of age or older, as required for a conviction of indecent liberties with a child. (Ill. Rev. Stat. 1979, ch. 38, par. 11—4(a)(3).) In his argument, the defendant correctly cites *People v. Dalton* (1981), 93 Ill. App. 3d 264, 417 N.E.2d 197, for the proposition that the *corpus delicti*, including proof of age where necessary, cannot be established by an extrajudicial verbal confession or admission alone. This proposition is correct, and if the only evidence of the defendant's age in the case at bar was the testimony of Officer Layman that the defendant had given his age as 23 and his date of birth as June 11, 1957, he would have no alternative but to find the evidence offered insufficient. However, as the *Dalton* case further indicates, corroboration of the defendant's extrajudicial statement concerning his age will satisfy the evidentiary requirements. That corroborative evidence need not be such as would

independently establish age beyond a reasonable doubt but need only be sufficient to insure the veracity of the defendant's out-of-court statement. *People v. Dalton* (1981), 93 Ill. App. 3d 264, 266, 417 N.E.2d 197, 199.

■■ In *People v. Lett* (1978), 61 Ill. App. 3d 467, 378 N.E.2d 208, the defendant's extrajudicial admission that he was over 17 years of age was deemed to be corroborated by the following evidence: testimony that he was a "man"; a witness' description that the perpetrator was in his 20's; the fact that the defendant had a valid driver's license, wore a 1972 class ring, and had been in the Army for two years. In the case at bar, the following evidence regarding the defendant's age emerged during trial: Officer Minton described the defendant as a "man" and as a "black male"; Officer Layman described the defendant as a "gentleman"; the defendant testified that he lived in a house with a 23-year-old girlfriend and her two-year-old child, and that he was employed full time as a painter for his landlord; the jury learned that the defendant had been incarcerated in the county jail since July 11, 1980, because he was unable to make bond; the defendant was impeached with a prior felony robbery conviction of May 9, 1977. None of these factors is conclusive proof of the defendant's age, but taken into consideration with the defendant's extrajudicial statement, they provide adequate evidence of his age.

In addition, the defendant testified at trial, thus providing the members of the jury an opportunity to independently assess his age and thereby corroborate his statement to Officer Layman. This factor contrasts with *People v. Lett* (1978), 61 Ill. App. 3d 467, 378 N.E.2d 208, and *People v. D'Angelo* (1975), 30 Ill. App. 3d 86, 333 N.E.2d 525, in which the defendant did not testify, but sufficient corroborative evidence was still found.

The defendant's final contention is that in sentencing him the trial court improperly considered that his prior probation for robbery was revoked for a subsequent rape. He bases his contention on the fact that he was never prosecuted criminally for the rape and thus the trial court did not have reliable evidence that a rape occurred.

The sentencing judge was presented with a copy of an order entered January 23, 1979, by Circuit Court Judge Stone in which Judge Stone found that the defendant was convicted of the offense of robbery on May 9, 1977, and was placed on probation for four years. Judge Stone also found that the defendant violated the terms of his probation in that on November 21, 1978, he committed the offenses of rape and unlawful restraint. Upon this basis, Judge Stone revoked the defendant's probation and sentenced him to a three-year prison term on the original robbery conviction.

The defendant was called to the stand during the sentencing hearing

for the instant offenses and was questioned about the earlier probation revocation. He testified that the rape charge was dismissed after he was sentenced for violating his probation. He also testified that the rape victim was his girlfriend. On cross-examination, the State elicited from the defendant the fact that his girlfriend jumped out of a second-story window to escape and that he was represented by counsel at the time of his contested probation revocation hearing.

■■ Clearly there was sufficient evidence presented to support the conclusion that the defendant had committed the crime of rape and for the trial court to consider that information in sentencing the defendant for the instant offenses. Ordinary rules of evidence need not be followed during a sentencing hearing. (*People v. Adkins* (1968), 41 Ill. 2d 297, 242 N.E.2d 258.) As long as the evidence considered is competent and material, as is the record of the defendant's probation revocation hearing in the case at bar, the sentencing court may search diligently for such evidence to be used as factors in aggravation or mitigation. *People v. Williamson* (1979), 69 Ill. App. 3d 1037, 388 N.E.2d 240.

For the foregoing reasons the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

BARRY, J., concurs.

Mr. JUSTICE HEIPLE, specially concurring:

While I concur with the result reached by the majority, I do not concur with the rationale which cites *People v. Dalton* (1981), 93 Ill. App. 3d 264. Two of the members of this panel also participated in the *Dalton* decision. *Dalton*, in my view, was a gratuitous and unnecessary reversal of a convicted sex offender on the grounds that his age was not established. Yet, there was no dispute as to the defendant Dalton's age. No dispute at all. He was of the requisite age.

Likewise, in this case, there is no dispute as to age. The crime here is indecent liberties. The law requires that the defendant be 17 years of age or older. Defendant told the officer that he was 23 years old and that his birthday was June 11, 1957. The majority opinion would reverse if there were no other corroborating evidence. I would not. His age was given, and the judge and jury had an opportunity to observe the defendant and thus, by observation, to corroborate the stated age. That should be quite sufficient.

Opprobrium should not be heaped on this court, however, for the decision in *Dalton* nor for their rationale in this case. The majority is attempting to follow judicial precedent and correctly cites an earlier decision of our supreme court which supports their line of argument. That

is *People v. Rogers* (1953), 415 Ill. 343. That case insulted common sense. *Stare decisis* is a valid legal proposition. When the position is wrong, however, courts should not remain wedded to error in perpetuity. This is just such a case.

A person's statement as to his own age is always hearsay. No one remembers his own birth. When a person gives his age, he is repeating what someone has told him, or what he has seen written down. This is so whether his statement as to age is given in court or out of court. When a person states his age, however, the other party has an opportunity to look at the person and make observations by way of verification or denial. That is evidence enough. Any other ruling flies in the face of ordinary experience and common sense.

*People v. Dalton* and *People v. Rogers* do precisely that. I, for one, do not care to republish and perpetuate that error.