**UNITED STATES of America ex rel. Demetrius JACKSON, Petitioner,**

v.

**Thomas PAGE, Respondent.**

No. 96 C 4945.

United States District Court, N.D. Illinois, Eastern Division.

July 31, 1997.

---

■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■

Demetrius Jackson, Menard, IL, pro se.

Arleen C. Anderson, Attorney General's Office, Chicago, IL, for respondents.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Following a bench trial in April 1992, petitioner Demetrius Jackson was found guilty of first degree murder. He pursued state appellate and postconviction remedies without success, and now petitions this Court for a writ of habeas corpus under the newly amended 28 U.S.C. § 2254.[1] Although Jackson's petition originally challenged his conviction on a number of constitutional grounds, his reply brief abandoned all but one—the prosecution's alleged failure to prove Jackson's guilt beyond a reasonable doubt. After carefully reviewing Jackson's petition, the Court denies it.[2]

## RELEVANT FACTS

### I. Jackson's Path to Habeas

■■■ Jackson was tried before a judge in Cook County for the murder of Clinton Walker. On April 2, 1992, the judge found Jackson guilty as charged and imposed a 35-year prison sentence. Jackson appealed his conviction to the Illinois Appellate Court, First District, which affirmed his conviction in an unpublished order on February 14, 1994. Jackson filed with the Illinois Supreme Court a petition for leave to appeal ("PLA") this ruling; the PLA was denied on

June 24, 1994 without opinion. Jackson then made several efforts to obtain postconviction relief, none of which was successful. He filed this habeas petition on May 16, 1996. We take the following facts from the state appellate court's opinion on direct appeal.[3]

### II. The Murder of Clinton Walker

On October 30, 1990, 20–year–old Clinton Walker was shot in the back. Chicago police officer Eugene Schleder found him, wounded but still alive, lying face down on a sidewalk in the 3547/3549 South Federal Stateway Gardens Housing Projects ("Stateway Gardens"). While searching for signs of identification or a weapon on Walker's body, Officer Schleder told Walker that he "looked pretty bad, I thought he was going to die." Schleder asked Walker who had shot him. Walker replied, "Demetrius Jackson shot me." Walker later died, and his statement identifying Jackson as the shooter was admitted at trial as both an excited utterance and a dying declaration.

The only eyewitness to the shooting was sixteen-year-old Wayne Fleming, who testified for the prosecution. At trial, Fleming first provided some background information: he was a member of the Del Vikings street gang and had known both Jackson and Walker for years. Walker was a former Del Vikings member, but had left the gang in 1989. Jackson belonged to a rival gang called the Gangster Disciples, which had been feuding with the Del Vikings over who controlled drug sales in certain Stateway Gardens buildings. Fleming went on to describe what happened the day of the murder.

Fleming was talking to Walker outside the complex at 3547/3549 South Federal when he

---

1. Jackson filed his petition on May 16, 1996, nearly a month after the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214. Under the Act's amendments to 28 U.S.C. § 2254(d), a state court's application of federal constitutional law is reviewed only for reasonableness. See Lindh v. Murphy, 96 F.3d 856, 879 (7th Cir.1996), rev'd on other grounds, — U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); Spreitzer v. Peters, 114 F.3d 1435, 1441–42 (7th Cir.1997). The amendments apply to petitions (such as Jackson's) that were filed after the date of enactment. Lindh, — U.S.——, ——–——, 117 S.Ct. 2059, 2063–64, 138 L.Ed.2d 481.

2. The petition was originally filed in the Southern District of Illinois; it was transferred to this Court pursuant to 28 U.S.C. § 2241(d).

3. We must presume the state courts' factual determinations are correct if they were made after a hearing on the merits are fairly supported by the record. 28 U.S.C. § 2254(e)(1); Sumner v. Mata, 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). The presumption of correctness can be rebutted only by the petitioner's showing to clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Jackson does not attempt to make this showing.

saw Jackson walk out of his mother's apartment across the way at 3517 South Federal. Jackson was carrying a brown rifle bag and wore a black leather coat. He opened the bag, took out a rifle, and rested it on a railing, aiming it in Fleming and Walker's direction. Fleming was about five feet away from Walker, who was unarmed. Walker was walking backwards when Jackson fired the gun and shot Walker in the back. Fleming fled into the hallway inside 3549; he saw Walker run a short distance before collapsing on his stomach. It is not clear from Fleming's testimony what prompted Walker to tread backward, since his back was to Jackson and Fleming did not indicate that he warned Walker about the rifle aimed in his direction. Nor did Fleming testify that Walker turned to face his assailant at any time.

Physical evidence corroborated Fleming's description of the shooting. The medical examiner found the cause of death to be a gunshot wound to the back that lacerated Walker's right lung and spinal cord and exited through his right nipple. Because Walker's spinal cord was not severed, he could still move after he was shot. Neither the bullet nor the gun was recovered.

After the shooting, Fleming walked back out of 3549 and, along with some other Del Vikings, returned fire. They aimed toward the balcony at 3517, where three young men were standing.[4] Fleming fired a nine millimeter gun while one of his companions shot a .380 caliber weapon. Again, physical evidence corroborated Fleming's testimony: the police found expended nine millimeter and .380 caliber shell casings in the area around the buildings and discovered a bullet hole through a window screen in Jackson's apartment. Minutes after the first shot, the police arrived. As he stood near the first police car to arrive on the scene, Fleming saw Jackson leave, alone, in his grey car.

Fleming's testimony was not without its imperfections. While he stated at trial that Jackson had fired only one shot toward him and Walker, his written statement to the police prepared just after the incident recounted that Jackson had fired two shots. He also wavered as to whether Jackson had returned the Del Vikings' retaliatory fire. In addition, Fleming testified that during the shooting, he did not see anyone else around the area or in the playground that separated the 3547/3549 and 3517/3519 buildings. This conflicts with the testimony of Melissa Madison and Tonya Williams, who claimed to have been in the vicinity at that time, as well as with several other accounts.

Madison and Williams testified that they were walking through the playground between 3547/3549 and 3517/3519 when they heard a gunshot. Their statements about the shot's origin are equivocal. At trial, both Madison and Williams testified that the first shot came from 3547, but their previous written statements to the police indicated that it came from 3519. After hearing the shot, the two picked up Madison's children and ran toward 3519. When Madison reached the top of the stairs, she saw Jackson standing near the front of the building; he told her and Williams that the shooting had to stop. Williams noticed that he was wearing leather gloves. Soon afterward Madison saw four men standing on the porch outside Jackson's mother's apartment.[5] One had a rifle and another, a small gun. Williams testified that all four were youths around 15 years old and that Jackson was among them. Neither Madison nor Williams saw Jackson with a gun.

Jackson told Madison to go upstairs with the baby, while Williams remained with him. Jackson then told Williams that he wanted to go to the police station to "check on Anthony." Williams replied that "her Anthony," i.e., her boyfriend and the father of her child, Anthony Montgomery, was upstairs. She explained that he had been released from custody the day before. Williams' written statement reported that Jackson turned to the others, smiled, and said "woo-woo" or "wow-wow" and something else she did not understand, prompting her to smile back. During

---

4. The evidence conflicted as to whether Jackson remained on the balcony or whether he left and was replaced by someone else.

5. Williams' "corrected statement" to the police states that Jackson was standing in the first floor hallway next to apartment 102. The opinion does not say whether apartment 102 is where Jackson's mother lived.

this time, the shooting continued. Williams soon left with Jackson in his 1989 grey car and headed toward the police station.

But Anthony Montgomery was not there. He had left the police station at 10:30 p.m. the night before after being released from his arrest for disorderly conduct. Montgomery testified at trial that he, like Jackson, was a member of the Gangster Disciples and that Walker was affiliated with the Del Vikings. Montgomery saw Jackson the evening of October 29th and talked to him on the phone the next morning. Montgomery told Jackson that he was waiting at the police station with bond money for his friend, Anthony Hares. Hares was not released until about 6 a.m. on October 30th.[6] At about 12:10 p.m. on the 30th, Montgomery awoke to gunfire in the 3547 South Federal apartment he shared with his stepmother and daughter. He jumped up and looked out his window, which faced 3517. He saw Williams and Madison running with Madison's baby toward 3519. More gunshots rang out; Montgomery ran to the porch. From there he saw Fleming, Walker and another man on the ground. Fifteen minutes later, the police arrived, and Montgomery saw Jackson and Williams walk to the parking lot. After he talked to Williams, they got into Jackson's grey car and left.[7]

The last occurrence witness was Lamont Stewart, the building supervisor for 3517/3519. He stated that between 11:45 and 11:50 on October 30, he was standing between 3517 and 3519 and talking to Jackson. They heard between two and four shots, and immediately dove for cover. When Stewart looked up, he saw some men running toward 3547–3549. He reported the incident to his supervisor, then took a lunch break. An hour later, Stewart returned to work.

Stewart never saw Jackson with a gun. Although Stewart said he was "right there" when the first shots were fired, he did not see Fleming until the police arrived. Stewart's version of the events was corroborated in part by the testimony of Jackson's sister, Chiniko, who stated that she was at their mother's apartment all day, and saw no sign of Jackson.

Officer Juan Sandoval arrived on the scene with his partner, and interviewed Fleming in their police car. Officer Sandoval dispatched a flash message that a shooting had occurred at 3547–3549 South Federal, that Jackson had been identified as the shooter, and that he was last seen in a black leather coat driving a grey car.

Meanwhile, Officer Louis McNeal was working at the police station as a bond officer when a man and a woman stopped in to inquire whether Anthony Montgomery was still in custody. When he went to check on Montgomery's status, McNeal heard the radio broadcast that Jackson was wanted for murder. Having seen Jackson before, McNeal recognized him as the man who had just walked in. McNeal confirmed the message, then placed Jackson in lock-up. Jackson was later arrested and formally charged with Walker's murder.

### III. Proceedings on Direct Appeal

Jackson urged only one ground for reversal on direct appeal: "Whether the defendant was proved guilty beyond a reasonable doubt, where the sole eyewitness was so significantly impeached as to be wholly unreliable?" Applt. Br. at 2. Citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and a few state court cases, Jack-

---

6. It is not clear from the opinion when Montgomery told Jackson that he was waiting at the station with bond money for Anthony Hares. Presumably it was not the night of the 29th because Montgomery saw Jackson in person that night, and nothing in the opinion indicates that they saw each other at the police station. But if Hares was released from custody at 6:00 a.m. on the 30th, it is implausible that Montgomery said he was at the station in his phone conversation with Jackson that morning, unless Montgomery and Jackson talked before 6:00 a.m or Montgomery did not know that Hares had been released.

7. Again, it is not apparent from this sentence, which we repeated verbatim from the appellate court's opinion for fear of clarifying it incorrectly, who "he" and "they" are. We cannot tell if the "he" who talked to Williams was Montgomery or Jackson. If it was Montgomery, Jackson would have seen him and known that Montgomery was not at the police station. In addition, we do not know whether the "they" who got into Jackson's car includes Montgomery. Finally, it is not clear where the "talking" took place—in the parking lot or in the 3547/3549 housing complex.

son pointed out that the state is required to prove all elements of a crime beyond a reasonable doubt—a burden he claimed was not met in his case. First, Jackson contended that Fleming's eyewitness testimony should have been discounted because Fleming had been substantially impeached with his prior inconsistent statements at trial. The only other evidence pointing to Jackson was Walker's revelation to Officer Schleder that Jackson had pulled the trigger. This statement, Jackson argued, was just as unreliable as Fleming's testimony because the physical evidence established that Walker was not facing the shooter when he was shot, and that his death could have been caused by any one of the several armed men standing on the Stateway Gardens balconies. Left with only this grossly flawed evidence, the state could not possibly have proved that Jackson was Walker's murderer beyond a reasonable doubt.

The appellate court disagreed and affirmed Jackson's conviction, finding the evidence sufficient to sustain it. It explained that reviewing courts will set aside a conviction on grounds of insufficient evidence only when "the proof is so improbable or unsatisfactory that there exists a reasonable doubt of defendant's guilt." *People v. Jackson*, 256 Ill. App.3d 1101, 219 Ill.Dec. 666, 671 N.E.2d 833, slip op. at 7 (1st Dist.1994) [hereinafter "Slip op. at ——. "] (citing *People v. Collins*, 106 Ill.2d 237, 261, 87 Ill.Dec. 910, 920, 478 N.E.2d 267, 277 (1985)). The court emphasized that evaluating witness credibility and the weight and consistency of the evidence are functions committed to the fact finder, not the appellate court. *Id.* (citing *People v. Slim*, 127 Ill.2d 302, 307, 130 Ill.Dec. 250, 252, 537 N.E.2d 317, 319 (1989); *People v. Tye*, 141 Ill.2d 1, 152 Ill.Dec. 249, 256, 565 N.E.2d 931, 937 (1990); *People v. Pintos*, 133 Ill.2d 286, 291, 139 Ill.Dec. 832, 834, 549 N.E.2d 344, 346 (1989); and *People v. Freeman*, 85 Ill.App.3d 1129, 1135, 41 Ill.Dec. 216, 220, 407 N.E.2d 714, 718 (1st Dist.1980)).

Applying these principles to the facts before it, the court rejected the idea that Fleming's testimony was so incredible that it could not support Jackson's murder conviction. Slip op. at 7–8. Fleming had known Jackson for years, and testified that it was Jackson who removed a rifle from his bag and fired the shot that killed Walker. Slip op. at 8. The court considered the discrepancies in Fleming's testimony to be minor; although Fleming had departed from his written statement about how many shots Jackson fired, his description of the murder and identification of Jackson as the culprit remained steadfast. *Id.* Moreover, physical evidence corroborated Fleming's account of the events following the shooting. *Id.* Fleming had testified about the kinds of weapons used in the retaliatory fire toward 3517/3519, and the police found shell casings corresponding to those weapons in the area, as well as a bullet hole through the window screen in Jackson's mother's apartment. *Id.*

As for Walker's near-death statement, the court held that it was "clearly" admissible as a dying declaration under Illinois evidence law. *Id.* (citing *People v. House, 141* Ill.2d 323, 380, 141 Ill.2d 323, 349, 152 Ill.Dec. 572, 566 N.E.2d 259, 285 (1990)). Walker's statement also satisfied the three conditions for a spontaneous declaration. Id. (*citing People v. Lawler, 142* Ill.2d 548, 559–60, 154 Ill.Dec. 674, 679, 568 N.E.2d 895, 900 (1991)). The court acknowledged that a third party's questions to the declarant can destroy spontaneity, but explained that "a simple question such as 'what happened' will not." *Id.* at 8–9 (citing *People v. Damen*, 28 Ill.2d 464, 471, 193 N.E.2d 25 (1963)). Consequently, Officer Schleder's asking Walker who had shot him did not render Walker's identification inadmissible. *Id.* at 9. In sum, the evidence from Fleming and Walker was not so unreliable that it left the state without sufficient evidence to convict Jackson of murder. In closing, the court delivered some parting shots, noting that the killing was drug-motivated and pronouncing Jackson's trip to the police station a failed attempt to manufacture an alibi. Id.

Jackson petitioned the Illinois Supreme Court for leave to appeal the appellate court's ruling, arguing again that the state had failed to prove that Jackson was guilty beyond a reasonable doubt because the state's eyewitness and Walker's statement—the only evidence establishing him as ·the murderer—were wholly unreliable. Jackson had representation, but chose to file a pro se

addendum to the PLA. His pro se brief raised the additional issue that the trial court erred in admitting Jackson's gang affiliation for the purpose of establishing motive. The supreme court denied leave to appeal without opinion on June 4, 1994.

## IV. State Postconviction Proceedings

Jackson's next move was a petition for postconviction relief, which he submitted to the trial court on May 11, 1995. The petition stated that Jackson had meritorious claims for postconviction relief under the Sixth and Fourteenth Amendments, but provided no further specificity about those claims, stating simply that "[p]etitioner is a layman and does not possess sufficient legal knowledge to allege with specific particularity the rights which were violated" and requesting appointment of counsel. Postconv. Pet. at 2. The trial court dismissed the petition on the grounds that it was time-barred; that the court was prevented from reviewing any trial errors by either waiver (issues not presented on direct review) or res judicata (issues already decided on direct review); and that the petition contained insufficient allegations of constitutional error. Jackson appealed this

ruling; however, his attorney sought leave to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), citing the lack of meritorious appealable issues. The appellate court agreed, finding "no issues of arguable merit," and granted the motion to withdraw on February 3, 1997. In the same order, it affirmed the trial court's dismissal of Jackson's postconviction petition.

■■■ The record contains a few other documents memorializing Jackson's state court efforts to overturn his conviction. On June 13, 1996, Jackson filed a second notice of appeal in the Circuit Court of Cook County, and six months later moved the Illinois Appellate Court to "assign counsel on appeal other than [the] public defender and proceed on petition for newly discovered evidence." The motion was denied on January 27, 1997 without opinion. Jackson did not seek leave to appeal either the January 27 or the February 3 appellate rulings.[8] While his state court appeals were pending, Jackson filed a habeas petition in this Court. The state proceedings have since concluded, permitting us to take up Jackson's petition.[9]

---

**8.** Jackson states in his reply brief that on May 10, 1996, he filed in the state trial court a petition for Writ of Error Coram Nobis and an Order to Show Cause to Vacate Judgment for Newly Discovered Evidence. Both documents are attached to the brief, but there is no indication that either was actually filed in court. Nor does it appear that a court ruled on these motions. In any event, the motions are not relevant to our determination on habeas because they are premised on grounds that Jackson forsakes in his reply brief.

**9.** Jackson told this Court in his reply brief that a state court petition remains pending in the Circuit Court of Randolph County. This Court surmises from Jackson's description that it is a petition for postconviction relief claiming ineffective assistance of appellate counsel for failure to raise certain issues on direct appeal. Jackson believes that his attorney did not preserve challenges to the trial court's admission of certain evidence—the victim's dying declaration and testimony that the murder was gang-related. This petition does not give us pause, however.

It is well-established that a federal court should not consider a habeas petition until the petitioner has exhausted state court avenues of relief. *See Castille v. Peoples*, 489 U.S. 346, 349, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989); *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct.

18, 19, 70 L.Ed.2d 1 (1981); *White v. Peters*, 990 F.2d 338, 341 (7th Cir.1993) ("Federal-state comity demands that a habeas petitioner first give the state courts an opportunity to pass on his federal claims, even if those courts would be expected to view such claims unfavorably"). Nevertheless, if further state court proceedings would be futile because a state procedural bar prevents further state court consideration, the petitioner's claims are ripe for federal habeas review. *See White*, 990 F.2d at 341 ("futility is a recognized exception to the exhaustion of state remedies requirement") (citing *Duckworth*, 454 U.S. at 3, 102 S.Ct. at 19). Jackson's pending state petition is futile because any claims he may have raised in it are time-barred. Petitions for postconviction relief may not be filed more than three years after the date of conviction or six months after the state supreme court denies leave to appeal, whichever is sooner. 725 ILCS 5/122–1. Five years have passed since Jackson's conviction, and the supreme court refused leave to appeal more than three years ago. We are therefore confident of the pending petition's futility, and conclude that it does not warrant our abstention from this case. *Cf. U.S. ex rel. Johnson v. Roth*, 1997 WL 83302 (N.D.Ill. Feb.19, 1997) (dismissing habeas petition without prejudice in light of pending and viable state court appeal from trial court's denial of postconviction relief).

ANALYSIS

## I. Exhaustion and Procedural Default

### A. Legal Standards

 The preliminary step in any habeas corpus proceeding is determining whether the petitioner has complied with the requirements to exhaust state remedies and to avoid procedurally defaulting the substantive claims by adequately presenting them to the state courts. *Lostutter v. Peters*, 50 F.3d 392, 394 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 130, 133 L.Ed.2d 79 (1995). "Exhaustion is accomplished when claims have been presented to the highest state court for a ruling on the merits, or, when the claims could not be brought in state court because no remedies remain available at the time the federal petition is filed." *Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir.1991) (citing *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1132 (7th Cir.1990) and *Engle v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982)). As the Supreme Court noted in *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 2554–55, 115 L.Ed.2d 640 (1991), the exhaustion requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights."

 A habeas petitioner's claims are procedurally defaulted when the federal claims were not "fairly presented" to the state courts. *Jones v. Washington*, 15 F.3d 671, 675 (7th Cir.1994); *see also Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir.1992). Procedural default "occurs when a claim could have been but was not presented to the state court and cannot, at the time that the federal court reviews the habeas petition, be presented to the state court." *Resnover v. Pearson*, 965 F.2d 1453, 1458 (7th Cir.1992). Habeas petitioners may fall into the procedural default trap by failing to pursue all the appeals required under state law in a timely manner, or by neglecting—notwithstanding diligent pursuit of all required appeals—to raise at the state level the federal claims asserted in the habeas petition. *See United States ex rel. Balderas v. Godinez*, 890

F.Supp. 732, 738 (N.D.Ill.1995). Procedural default also occurs when the state court decision supporting the petitioner's confinement was decided on an adequate and independent state law ground (either substantive or procedural). *See Coleman*, 501 U.S. at 729–32, 111 S.Ct. at 2553–55. As Coleman explained, "[j]ust as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Id.* at 731–32, 111 S.Ct. at 2555. We now examine Jackson's claims to see whether any fall victim to the exhaustion or procedural default doctrines.

### B. Three of Jackson's Four Claims Were Defaulted and/or Abandoned

 Jackson's pro se petition for habeas corpus initially raised four issues: 1) the State failed to prove guilt beyond a reasonable doubt; 2) the trial court violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment by a) improperly limiting the scope of cross examination, b) denying Jackson's motion in *limine* to exclude Walker's statement, c) denying his motion for a directed verdict when the State's evidence was fraught with inconsistencies, and d) allowing the State to attack a witnesses's credibility using prior convictions; 3) prosecutorial misconduct during closing argument denied Jackson the right to a fair trial; and 4) his trial counsel rendered ineffective assistance because a) the attorney's failure to investigate the crime scene deprived Jackson the testimony of two potential alibi witnesses, b) the attorney failed to adequately prepare a defense, and c) failed to file a motion to suppress evidence from the investigating officer. Jackson's reply brief abandons all but the claim that the State failed to meet its burden of proof—i.e., that his conviction was based on insufficient evidence. He declines "to address the remaining claims in his petition because he did not exhaust them on direct appeal and does not feel that he can defend those issues under the present prison lockdown and absence of law clerks, materials or access thereto." [10]

---

10. Courts permit parties to withdraw such claims by abandoning them in a reply brief. *See*

Reply Br. at 3.

Although Jackson is wrong about exhaustion, he is right that we are barred from reviewing these claims. Claims two through four are indeed exhausted and ripe for federal habeas review because time bars prevent the state courts from considering them any further. *See Resnover v. Pearson,* 965 F.2d 1453, 1458 (7th Cir.1992); *see also* 725 ILCS 5/122–1. Procedural default nonetheless prevents us from addressing these claims because they were not presented to the state courts on direct appeal or during postconviction proceedings. *See Picard v. Connor,* 404 U.S. 270, 276, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971).[11] We would thus be

*Rock v. Coombe,* 694 F.2d 908, 914 (2d Cir.1982) (holding that habeas petitioner, whether pro se or represented, may abandon unexhausted claims if he "unequivocally acknowledge[s]" that he wishes to do so; there is no reason for the court "to go through the jejune exercise of dismissing the petition and requiring that a new piece of paper be filed."); *see also West Allis Mem. Hosp. v. Bowen,* 852 F.2d 251, 257 (7th Cir.1988) (declining to address common law claims that party raised in opening brief but abandoned in reply brief); *Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1408 n. 1 (9th Cir.1990) ("Adriana's new attorneys filed the reply brief, which specifically abandons the following arguments raised in the opening briefs.... Because Adriana abandoned these arguments, we do not address them."). It is likewise appropriate to permit Jackson to do so. His reply brief states unequivocally in writing that he desires to abandon all claims except his challenge to the sufficiency of the evidence.

11. The only conceivable exception is Jackson's ineffective assistance of counsel claim. His failure to raise this claim on direct appeal to the state appellate court will not be fatal if he properly raised it on postconviction review. *Momient–El v. Detella,* 118 F.3d 535, 539–40 (7th Cir.1997). Nevertheless, the claim presented on postconviction review must be the very same specific ineffective assistance claim raised on habeas—trial counsel's alleged failings regarding investigation, defense preparation, and motion practice—otherwise, it is procedurally defaulted. *Id.* Jackson's postconviction petition mentioned only a "Sixth Amendment" violation without further explication. This could refer, among other things, to a Confrontation Clause violation or ineffective assistance of appellate or trial counsel in any number of areas. We have no way of knowing whether the Sixth Amendment claim in that petition matches the one before us. Furthermore, the trial court dismissed Jackson's postconviction petition on independent state law

obliged to reject these claims regardless of their merit "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565. Nothing in Jackson's filings or the record supplies cause for his failure to raise these claims at the state court level. Nor do we believe that the fundamental miscarriage of justice exception applies here. Accordingly, we limit our review to the sufficiency of the evidence.[12] Our first task is to determine whether procedural default extinguishes this claim as well.

grounds of time bar and lack of specificity. Even if the appellate court's determination on the *Finley* motion that Jackson's appeal of the postconviction petition dismissal contained "no issues of arguable merit" constitutes a decision on the merits and removes all state procedural bars, *see Johnson v. Roth,* 1997 WL 285743, at *3 (N.D.Ill. May 22, 1997), we would have to examine the *Finley* brief (which is not before us) to ensure that the issues found to lack merit are exactly the same as the ineffective assistance claim before us. Since Jackson has abandoned this claim, however, we need not make this inquiry.

12. Two other preliminary matters require brief attention. Jackson has filed a motion to strike portions of the state's answer, as well as a motion for production of documents. Neither has merit. Motions to strike may be granted to rid a pleading of redundant, immaterial, impertinent, or scandalous matter. Fed.R.Civ.P. 12(f). None of the statements that Jackson objects to in the answer contain such matter. Accordingly, we deny the motion to strike. The motion for production of documents must also be denied. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley,* —— U.S. ——, —— ——, 117 S.Ct. 1793, 1796–97, 138 L.Ed.2d 97 (1997). He may engage in discovery only upon a showing of "good cause." *Id.; Rules Governing § 2254 Cases in the Unites States District Courts* 6(a). Jackson's motion contains no allegations that establish "good cause" for this Court to order document production. *Cf. Bracy,* —— U.S. at ——, 117 S.Ct. at 1799 ("Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." (citations and internal quotations omitted).

## C. Fair Presentation of the Sufficiency of the Evidence Claim

 Jackson's sole remaining claim is that the state's failure to prove his guilt beyond a reasonable doubt violated his federal constitutional rights. The constitutional right to this burden of proof is found in *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970), which held that the Due Process Clause of the Fourteenth Amendment requires every element of a crime to be proven beyond a reasonable doubt. In addition, *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979), established that for purposes of habeas review, the relevant question is whether, when the evidence is viewed in a light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The first issue confronting us is whether Jackson properly raised this federal claim in the state courts. "A habeas petitioner must provide the state courts with a fair opportunity to apply constitutional principles and correct any constitutional error committed by the trial court." *Bocian v. Godinez*, 101 F.3d 465, 469 (7th Cir.1996) (quoting *United States ex rel. Sullivan v. Fairman*, 731 F.2d 450, 453 (7th Cir. 1984)) (internal quotations omitted). The petitioner accomplishes this task if he presents his claims in a way that "fairly alert[s] the state court to any applicable [federal] constitutional grounds for the claim." *Id.* (quoting *Green v. Peters*, 36 F.3d 602, 605 (7th Cir. 1994)) (internal quotations omitted). In other words, "both the operative facts and the controlling legal principles of a constitutional claim must be submitted to the state court." *Id.*

 Simply asserting that the state has failed to prove guilt beyond a reasonable doubt does not automatically raise a federal *Jackson v. Virginia* claim. *U.S. ex rel. Kokoraleis v. Director of IDOC*, 963 F.Supp. 1473, 1482 n. 1 (N.D.Ill.1997); *see Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam) (raising a state law claim that is similar to a federal claim is not fair presentation of the federal claim); *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir.1992) (same); *United States ex rel. Riggins v. McGinnis*, 859 F.Supp. 309,

315 (N.D.Ill.1994) (same), aff'd, 50 F.3d 492 (7th Cir.1995). Indeed, Illinois state courts recognize an independent state law basis for reversing a conviction based on a lack of evidentiary support, *see People v. Pintos*, 133 Ill.2d 286, 291, 139 Ill.Dec. 832, 834, 549 N.E.2d 344, 346 (1989), and, as a result, many state courts perform a sufficiency of the evidence analysis without regard to federal constitutional principles. *See id.; People v. Hister*, 60 Ill.2d 567, 572, 328 N.E.2d 531, 534 (1975); *People v. Lindsey*, 73 Ill. App.3d 436, 447, 29 Ill.Dec. 721, 729–30, 392 N.E.2d 278, 286–87 (1st Dist.1979). To ensure that he properly raised his *Jackson* claim in the state courts, Jackson must have:

> (1) rel[ied] on pertinent federal cases employing constitutional analysis; (2) rel[ied] on state cases applying constitutional analysis to a similar factual situation; (3) assert[ed] the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege[d] a pattern of facts that is well within the mainstream of constitutional litigation.

*Verdin*, 972 F.2d at 1473–74. Satisfying any of these four factors does not guarantee a finding of fair presentment, however; we must consider the specific facts in this case. *Id.* at 1474.

 Jackson's habeas petition argues that the state's evidence was insufficient for three reasons: 1) the state's sole eyewitness was unreliable; 2) Walker's dying declaration was unreliable; and 3) the admission of evidence pertaining to gang affiliation and the fight over drug sales as a motive for the murder was improper. We may dispose of the last component summarily—Jackson never brought the issue of admitting gang-related evidence to the state appellate court's attention on direct appeal. The argument was raised in Jackson's pro se addendum to the PLA filed in the state supreme court, but this tactic did not preserve the issue because "submitting a claim to the state's highest court on discretionary review does not constitute fair presentment." *Verdin*, 972 F.2d at 1479 n. 13; *see Castille v. Peoples*, 489 U.S. 346, 350, 109 S.Ct. 1056, 1059–60, 103 L.Ed.2d 380 (1989); *Riggins*, 859 F.Supp. at 316. Moreover, we cannot mold a claim that challenges a state court evidentiary ruling on admissibility into one that attacks the state's

sufficiency of the evidence. These are distinct claims; an erroneous evidentiary ruling is normally not cognizable on habeas, *see White v. Peters*, 990 F.2d 338, 341 (7th Cir. 1993), unless it can be said to have "violated the defendant's right to due process by denying him a fundamentally fair trial." *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir.1994). But Jackson never asserted violation of his fair trial rights in the state courts. In short, we cannot assess this component of Jackson's claim because it raises a constitutional issue that the state courts never had a chance to consider on the merits.[13] *See Pierson v. O'Leary*, 959 F.2d 1385, 1393–94 (7th Cir. 1992) (state court not fairly presented with Fifth Amendment claim because "thrust" of petitioner's argument to state appellate court was a Fourth Amendment violation).

■ Moving backwards to the second component, it might appear at first glance that Jackson's challenge to Walker's near-death statement fails for the same reasons. The state appellate court simply performed an admissibility analysis without ever addressing the statement's constitutional implications. Finding the state evidentiary requirements for both a dying declaration and a spontaneous declaration met, the court held that "[d]eceased's response was properly admissible." Slip op. at 9. But that does not end the inquiry. Fair presentment is accomplished if the federal constitutional claim is either mentioned in the state court's opinion or submitted in the brief to the state court. *United States ex rel. Reyes v. Gramley*, 1994 WL 649981, at *3 (N.D.Ill. Nov.16, 1994). *Cf.*

*Riggins*, 859 F.Supp. at 315 (claim not fairly presented where absent from both brief on direct appeal and appellate court's opinion). And Jackson's appellate brief fairly alerted the court that he was arguing Walker's statement violated his constitutional right to proof beyond a reasonable doubt. Just below the paragraph in which Jackson contends that Walker's declaration was unreliable in light of the physical evidence and the presence of many possible perpetrators, and that his statement along with Fleming's equally unreliable eyewitness testimony was "the only evidence on which the court could base a finding that Demetrius had fired the fatal shot," Jackson cites *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and the Fourteenth Amendment for the principle that the state must prove guilt beyond a reasonable doubt. Although Jackson does not cite *Jackson v. Virginia*, he sets out the *Jackson* standard that "reviewing courts are charged with determining whether or not any rational trier of fact could have found that the evidence, viewed in a light most favorable to the State, established the defendant's guilt beyond a reasonable doubt." As such, Jackson satisfied two elements in the *Verdin* fair presentment test: he relied on federal cases employing constitutional analysis and used "terms so particular as to call to mind a specific constitutional right." 972 F.2d at 1473. In light of this, the fact that the appellate court did not tie Walker's statement to Jackson's sufficiency of the evidence claim does not exile it to the land of procedural default.[14]

---

**13.** Even if this issue had been fairly presented to the state courts, we still could not evaulate it because Jackson never developed it in his reply brief.

**14.** Construed very broadly, Jackson's reply brief might be strained to read that admitting Walker's declaration violated his fair trial rights, as well as the Sixth Amendment's Confrontation Clause. First, in the section of his brief addressing Walker's statement, Jackson includes one sentence that states "the judge denied Petitioner due Process" in admitting it. Reply Br. at 12. We could read this as asserting that the court's allegedly erroneous evidentiary ruling denied Jackson the constitutional due process right to a fundamentally fair trial. *See Milone*, 22 F.3d at 702. Second, the admissibility challenge, with its emphasis on reliability, could be construed as an alleged Confrontation Clause violation; the

Clause requires that hearsay statements used at trial "bear[] adequate indicia of reliability." *Idaho v. Wright*, 497 U.S. 805, 815–16, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990) (internal quotations and citations omitted). In fact, fair trial and Confrontation Clause claims are about the only ways to lodge a direct constitutional challenge to admissibility of hearsay statements. *See Riggins v. Nevada*, 504 U.S. 127, 147, 112 S.Ct. 1810, 1821–22, 118 L.Ed.2d 479 (1992) (Scalia, J., concurring) ("Except in cases involving a violation of a specific constitutional provision such as the Confrontation Clause, this Court may not reverse a state trial judge's action in the admission of evidence unless the evidentiary ruling so infuses the trial with unfairness as to deny due process of law.") (internal quotations, alterations and citations omitted). But even discharging our duty to read pro se petitions liberally, *see Coulter v. Gramley*, 93 F.3d 394, 397 (7th Cir.

■ Finally, it is clear that the first component of Jackson's sufficiency of the evidence claim—the unreliability of Fleming's testimony—was both presented and addressed as a federal constitutional claim in the state courts. First, it was fairly presented in the appellate brief for the same reason that we found the attack on Walker's declaration adequately framed as a constitutional claim. The *Winship* citation and language identical to the *Jackson* standard immediately follow Jackson's factual argument that Fleming's testimony was so substantially impeached that it should have been discarded as unreliable. Second, the cases on which the appellate court relied to resolve whether the discrepancies in Fleming's testimony warranted reversing his conviction are all state cases that employ federal constitutional analysis. *See Verdin,* 972 F.2d at 1475 ("Of course, if those state cases rest on federal constitutional grounds, they must be accepted on that basis by the habeas court."). *People v. Collins,* 106 Ill.2d 237, 87 Ill.Dec. 910, 478 N.E.2d 267 (1985), which the appellate court cited for the standard of review applicable to this claim, explicitly relies on *Jackson v. Virginia.* *Collins* quotes the *Jackson* "any rational trier of fact" standard, notes that all the evidence is to be viewed most favorably to the prosecution, and then applies these principles to the facts before it. *Id.* at 261–62, 87 Ill.Dec. at 920, 478 N.E.2d at 277. In the same section of the opinion, the appellate court cited *People v. Tye,* 141 Ill.2d 1, 152 Ill.Dec. 249, 565 N.E.2d 931 (1990), which applies the *Jackson* standard as quoted in *Collins.* Given that the appellate court cites cases using federal standards, we cannot help but find that, "as a pragmatic matter, it is probable that the state tribunal was alerted to the federal quality of the claim." *Verdin,* 972 F.2d at 1476.

The above analysis leaves Jackson's sufficiency of the evidence claim mostly intact. While we cannot consider the effect that admitting gang and drug-war related evidence had on Jackson's conviction, we are empowered to decide whether Fleming's testimony and Walker's declaration left the state with evidence that was constitutionally sufficient to convict. We now move on to the merits of that claim.

## II. Decision on the Merits

### A. Standard of Review

■ For this remaining claim, the standard of review is strict. Under the habeas corpus statute as recently amended, federal courts must deny a petition for habeas corpus with respect to any claim adjudicated on the merits in a state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The new law applies here because Jackson's petition was filed after the law was enacted. *See Lindh v. Murphy,* — U.S. —, — – — 117 S.Ct. 2059, 2063–64, 138 L.Ed.2d 481 (1997). Under the amended statute, federal courts must accord "greater deference to the determinations made by state courts than they were required to under the previous law." *Spreitzer v. Peters,* 114 F.3d 1435, 1441 (7th Cir.1997) (internal quotations and citations omitted). The standard of review for mixed constitutional questions of law and fact such as those presented by *Jackson* claims is whether the state court's application of clearly established Supreme Court law was reasonable. *Id.; Gomez v. Acevedo,* 106 F.3d 192, 199 *(1997), petition for cert. filed* (U.S. May 5, 1997) (No. 96–8978); *Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1997), *rev'd on other grounds,* — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). A state court has reasonably applied clearly established Supreme Court caselaw if its application is "at least minimally consistent with the facts and circumstances of the case." *Spreitzer,* 114 F.3d at 1442 (internal quotations and citation omitted). Put another way, " '[t]he statutory "unreasonableness" standard al-

1996), does not warrant our substantive consideration of these two potential claims. Nothing in Jackson's state court filings, either on direct appeal or postconviction review, fairly alerted those courts to fair trial right or Confrontation

Clause violations. Although they had the operative facts before them, the state courts were never presented with any legal theory other than the constitutional sufficiency of the evidence.

lows the state court's conclusion to stand if it is one of several equally plausible outcomes.'" *Id.* (citing *Hall v. Washington,* 106 F.3d 742, 748–49 (1997)).

As discussed above, *Jackson v. Virginia* is the seminal Supreme Court case defining habeas review of constitutional sufficiency of the evidence claims. The *Jackson* decision instructs federal habeas courts that a conviction must stand unless "it is found that upon the record evidence adduced at the trial that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324, 99 S.Ct. at 2792. The evidence must be viewed in a light most favorable to the prosecution. *Id.* at 319, 99 S.Ct. at 2789. Under this test, the fact finder is accorded substantial deference:

This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.

*Id.* Along these lines, a federal court faced with a record full of conflicts must "presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution." *Id.* at 326, 99 S.Ct. at 2793. *Jackson* indicated that less deference might be given to state appellate decisions applying its dictates, hinting that federal habeas review should be de novo. *Id.* at 324, 99 S.Ct. at 2791–92; *see Wright v. West,* 505 U.S. 277, 290, 112 S.Ct. 2482, 2488–89, 120 L.Ed.2d 225 (1992). But under the new statute, there is no question that federal courts are not to review state appellate decisions de novo; rather, these decisions are examined only for reasonable application of Supreme Court caselaw. Consequently, we must ask whether the appellate court here reasonably applied the *Jackson* standard in holding that the evidence was sufficient to convict Jackson of murder.

## B. Review for Reasonableness

To convict an individual of first degree murder in Illinois, the prosecution must prove beyond a reasonable doubt that 1) the person intended to kill or cause great bodily harm, or knew that his acts would cause death; or 2) the person knew that his acts created a strong probability of death or great bodily harm; or 3) the person was attempting or committing a "forcible felony other than second degree murder." 720 ILCS 5/9–1(a). Jackson does not contend that the state failed to establish 1), 2), or 3)—he agrees that Walker was murdered—but rather directs his challenge to the state's evidence of identity. Jackson insists that he is not their man because all the evidence connecting him to the crime was unreliable. Fleming's eyewitness testimony, he urges, was rife with inconsistencies, biased because Jackson belonged to a rival gang, and contradicted by several other witnesses. As for Walker's identification, Jackson contends that it was inconsistent with the physical evidence, which established that Walker was shot in the back and therefore could not have seen his shooter; failed to account for the possibility that any number of armed men on the scene, including Fleming, could have shot Walker; and unbelievable because uttered when Walker was fatally wounded and undoubtedly disoriented. Jackson claims that without Fleming and Walker's unreliable identifications, the state's case falls apart because the police recovered no other evidence, such as the murder weapon or fatal bullet, linking Jackson to the crime.

Although Jackson raises many excellent points that would be relevant to a fact finder evaluating the evidence for the first time, the scope of our review is far more narrow. We ask only whether the appellate court reasonably applied the *Jackson* standard. And we find that it did.

First, by citing state cases that incorporate the *Jackson* standard and emphasizing the need to defer to the fact-finder on issues of credibility and conflicting evidence, the appellate court relied on the factors that *Jackson* considered relevant in sufficiency of the evidence cases. Second, the appellate court proceeded to apply these factors to evidence

in the record. The court pointed out that Fleming had known Jackson for years, and was thus capable of identifying him as the man who pulled out a rifle and shot Walker from the balcony across the way. It found the inconsistencies in his testimony minor, and unrelated to the crucial details of the shooting. The court emphasized that physical evidence corroborated other portions of Fleming's testimony, such as his account of the retaliatory fire by the Del Vikings. Finally, the court ruled that Walker's identification was properly admissible under Illinois evidence law, and, as such, was reliable enough to establish Jackson as the shooter.

We find that the appellate court's determination that Fleming and Walker's identifications were sufficiently reliable to convict Jackson is firmly grounded in *Jackson v. Virginia*'s command to view the evidence in a light most favorable to the prosecution and to defer to the fact finder's "role as weigher of the evidence." 443 U.S. at 319, 99 S.Ct. at 2789. True, Fleming's testimony was far from ironclad. As a rival gang member, he was admittedly biased; his story was diametrically opposed to other accounts, such as Lamont Jackson's, which portrays Jackson as wholly uninvolved in the exchange of gunfire; and his testimony leaves unanswered questions, such as why he did not warn Walker that Jackson was about to shoot a rifle in their direction. Walker's identification, too, is subject to question, since he was shot in the back and no evidence indicates that he ever turned to face his killer. But if believed, both sources of evidence establish independently that Jackson was the murderer. "It is the fact-finder, not the appellate court that determines the credibility of witnesses' testimony." *Harmon v. McVicar*, 95 F.3d 620, 623 (1996). The appellate court here recognized this directive and obeyed it. Its decision is "at least minimally consistent with the facts and circumstances of the case,"

*Spreitzer*, 114 F.3d at 1442, and is, therefore, reasonable.

We forthrightly acknowledge that the evidence supporting Jackson's conviction is far from overwhelming. It rests solely on the statements of two witnesses—witnesses who were affiliated with rival gangs and flatly contradicted by others—and is unsubstantiated by any physical evidence. But § 2254 binds us. Jackson's real dispute is with the trial court's credibility determinations, not the appellate court's application of federal law. We simply cannot provide the kind of searching review he seeks. *See Ford v. Ahitow*, 104 F.3d 926, 939 (7th Cir.1997) (a federal habeas court "cannot choose the evidence it prefers to emphasize or make its own credibility determinations.").[15] Because the appellate court's determination of Jackson's sole substantive claim was not the product of an unreasonable application of Supreme Court caselaw, we must deny his petition for habeas corpus.

## CONCLUSION

After careful consideration, the Court determines that Jackson's conviction did not violate the Constitution in any manner that is cognizable on a petition for habeas corpus. The petition is denied and this action is dismissed.

---

**15.** Even if we retained de novo review powers under *Jackson*, we could not say that no rational fact-finder would have believed Fleming and/or Walker's statements that Jackson was the shooter. As the appellate court pointed out, Fleming never wavered on the crucial details of the shooting, and his uncertainty about the number of shots fired does not destroy his credibility given the ensuing gunfire from all directions. Moreover, Fleming never left the crime scene and talked willingly with the police officers when they arrived. In addition, although Walker was shot in the back, he could conceivably have turned around before he collapsed. Fleming may not have noticed in his panic to run from the gunfire, and the state's medical expert testified that Walker remained able to move after he was shot. Told by Schleder he appeared near death, Walker would have had little reason to lie about who shot him.